191 F.3d 1076 (9th Cir. 1999)
 HOWARD HERTZBERG; JOHN DEROSA; JEFFREY FEINMAN, on behalf of themselves and others similarly situated, Plaintiffs-Appellants,
v.
DIGNITY PARTNERS, INC.; BRADLEY N. ROTTER; ALAN B. PERPER; JOHN WARD ROTTER; STEPHEN T. BOW; PAUL A. VOLBERDING, Defendants-Appellees.
 No. 98-16394
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 18, 1999
Filed August 27, 1999
 
 Patrick J. Coughlin and Eric A. Issacson, Milberg Weiss Bershad Hynes & Lerach, San Diego, California; Alison M. Tattersall, San Francisco, California; Nadeem Faruqi, Faruqi & Faruqi, New York, New York; Stephen Rodd, Abbey, Gardy & Squitieri, New York, New York, for the plaintiffs appellants.
 Gerald W. Palmer, Jones, Day, Reavis & Pogue, Los Angeles, California, for the defendants-appellees. Mark Pennington, Securities & Exchange Commission, Washington, D.C., for the amicus.
 Appeal from the United States District Court for the Northern District of California. Charles A. Legge, District Judge, Presiding, D.C. No. CV-96-04558-CAL.
 Before: David R. Thompson and William A. Fletcher, Circuit Judges, and Robert S. Lasnik,[1] District Judge Opinion by Judge William A. Fletcher
 W. FLETCHER, Circuit Judge:
 
 
 1
 This case arises out of alleged misstatements and omissions contained in Appellee Dignity Partners, Inc.'s ("Dignity's") registration statement filed with the Securities and Exchange Commission for an initial public offering of Dignity common stock. Dignity was in the business of buying the rights to life insurance proceeds from people with AIDS, paying a lump sum up front and taking over the responsibility for paying the premiums. Shortly after the offering, the fact that AIDS patients were living longer than expected becauseof new AIDS treatments became public knowledge. As a result of the longer lives of the insured, Dignity posted huge losses, and the stock plummeted.
 
 
 2
 Plaintiffs/appellants Hertzberg, Derosa, and Feinman ("Hertzberg") are investors who purchased Dignity stock on the open market more than 25 days after the initial offering but before the news of the longer life expectancy or large losses became public knowledge. They brought a class action for several violations of the securities laws by Dignity, including violation of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. S 77k ("Section 11"). Hertzberg claims that Dignity knew of the longer life expectancy but failed to disclose it in the registration statement. The district court dismissed the Section 11 causes of action on the ground that, because appellants had not bought their stock in the initial public offering, or within 25 days thereof, they did not have standing to bring the claim. The district court later found that a proposed new class representative, who had bought Dignity stock within 25 days of the initial offering, was barred by the statute of limitations.
 
 
 3
 We reverse the district court's holding that the original named plaintiffs lacked standing under Section 11. Because of that holding, we do not reach the statute of limitations issue.
 
 BACKGROUND
 
 4
 On February 14, 1996, Dignity filed a registration statement for an initial public offering of approximately 2.7 million shares of common stock. Hertzberg asserts, on behalf of a class of persons who purchased Dignity stock between February 14, 1996, and July 16, 1996, that the registration statement contained materially false and misleading statements and omitted material facts. He seeks damages under Section 11 as well as under other provisions of the federal securities laws.
 
 
 5
 Dignity was in the business of making "viatical settlements." It purchased the rights to the proceeds of life insurance policies from individuals with terminal illnesses, and in exchange paid lump sums to the individuals and assumed responsibility for payment of premiums. The amounts Dignity paid to the individuals were based on their estimated life expectancies, and the profits Dignity received depended on the accuracy of those estimates. Nearly all of the individuals from whom Dignity purchased its rights had AIDS.
 
 
 6
 By 1995, new drugs and treatments for AIDS became available, and many of the individuals with whom Dignity had contracted began to live longer than expected. Hertzberg alleges that, as a consequence, the value of Dignity's business was in jeopardy because it could not collect the life insurance proceeds as rapidly as expected, it had to pay premiums for longer periods than expected, and it could no longer estimate with accuracy the life expectancy of the persons with whom it contracted.
 
 
 7
 Hertzberg alleges that the owners of this privately held company saw the prospect of their entire investment disappearing and decided to liquidate much of their holding by taking the company public. According to Hertzberg, the financial statements in Dignity's registration statement were misleading because they misrepresented the true worth of the business. Hertzberg alleges that shortly before the offering Dignity adopted the accrual method of accounting, under which Dignity counted the potential proceeds from a particular policy as income as soon as it purchased the rights, rather than when it actually received the proceeds. Hertzberg further alleges that this new accounting method was misleading because it hid the facts that Dignity was taking longer to collect on those policies and that Dignity could no longer accurately estimate when individuals would die. Finally, Hertzberg alleges that Dignity violated Section 11 by failing to disclose its inability to make accurate estimations of life expectancies, the "adverse trends" experienced in 1995, and the fact that its accrual Dignity's accounting method did not comport with Generally Accepted Accounting Principles.
 
 
 8
 After the facts concerning the lengthened life expectancies for AIDS patients became public knowledge, Dignity's stock fell from the initial offering price of $12 a share to about $6. In June of 1995, less that five months after the beginning of the initial public offering, Dignity announced an anticipated quarterly loss of $10 million, and a month later announced that it would abandon the viatical settlement business. As a result of these announcements, the stock fell to $1 a share before settling at about $2 at the time the action was filed.
 
 
 9
 Dignity moved to dismiss Hertzberg's Section 11 claims because the named plaintiffs had not purchased their shares "in" the registered offering. The district court, ruling from the bench, held that because the named plaintiffs purchased their stock more than 25 days after the registration statement was filed, they did not have standing to bring an action under Section 11. It therefore dismissed their Section 11 claims.
 
 
 10
 Nineteen days after the district court's ruling but more than a year after the action had been commenced, unnamed class member Charles Steinberg, who had filed a state court action against the same defendants on February 13, 1997,[2] filed a motion to intervene as a named plaintiff in the federal case in order to prosecute the class's Section 11 claim. Steinberg had bought Dignity's registered shares within eight days of the registration statement's effective date, thus coming within the district court's 25-day window.
 
 
 11
 The district court granted Steinberg's motion to intervene on February 20, 1998, and appellants amended their complaint to include Steinberg as a named plaintiff. Dignity again moved to dismiss, now arguing that the statute of limitations barred the entire class's Section 11 claims. The district court ruled that the class's Section 11 claims were time-barred. It concluded that because the original named plaintiffs had not had standing to bring individual Section 11 claims, their suit could not toll the statute of limitations for unnamed members of the class they had sought to represent.
 
 
 12
 Observing that the scope of Section 11 had not been resolved by this circuit, the district court invited the parties to submit briefs on whether an immediate appeal should be taken. The parties agreed that final judgment on the dismissed Section 11 claims should be entered under Rule 54(b), and the district court entered an order on June 29, 1998 expressly finding "no just reason for delay" and directing entry of final judgment on those claims. We have jurisdiction under 28 U.S.C. S 1291, and we reverse.
 
 DISCUSSION
 
 13
 We review the district court's interpretation of Section 11 de novo. See In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1403 (9th Cir. 1996). In determining the meaning of a statute, we look first to its text. In re: Kelly, 841 F.2d 908, 912 (9th Cir. 1988). Section 11(a) provides that where a material fact is misstated or omitted from a registration statement accompanying a stock filing with the Securities and Exchange Commission, "any person acquiring such security" may bring an action for losses caused by the misstatement or omission. 15 U.S.C. S77k(a). The district court read this phrase as if it had been written, "any person acquiring such security on the first day of an initial public offering or in the twenty-five day period thereafter."[3] This reading adds asignificant limitation not found in the original text.
 
 
 14
 The term "any person" is quite broad, and we give words their ordinary meaning. United States v. Alvarez-Sanchez, 511 U.S. 350, 357 (1994). According to Webster's Third New Int'l Dictionary (3d ed. 1986), "any" means "one, no matter what one"; "ALL"; "one or more discriminately from all those of a kind." This broad meaning of "any" has been recognized by this circuit. Madrid v. Gomez, 150 F.3d 1030, 1036 (9th Cir. 1998) (the court must accept "the plain meaning of the word `any.' In its conventional usage, `any' means `ALL--used to indicate a maximum or whole.' It certainly does not mean `some.' ") (citations omitted).
 
 
 15
 The limitation on "any person " is that he or she must have purchased "such security." Clearly, this limitation only means that the person must have purchased a security issued under that, rather than some other, registration statement. See Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967). While it might present a problem of proof in a case in which stock was issued under more than one registration statement,[4] the only Dignity stock ever sold to the public was pursuant to the allegedly misleading registration statement at issue in this case. Thus, as long as Hertzberg is suing regarding this security, he is "any person purchasing such security, " regardless of whether he bought in the initial offering, a week later, or a month after that.[5]
 
 
 16
 Further, paragraph (e) of Section 11 uses "the amount paid for the security (not exceeding the price at which the security was offered to the public)" as the baseline for measuring damages. 15 U.S.C. S 77k(e); see also 15 U.S.C. S 77k(g). Such a provision would be unnecessary if only a person who bought in the actual offering could recover, since, by definition, such a person would have paid "the price at which the security was offered to the public."[6] We will "avoid a reading which renders some words altogether redundant." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 574 (1995).
 
 
 17
 Finally, Dignity believes that its reading of Section 11 is supported by the Supreme Court's decision in Gustafson. We believe that Dignity is mistaken. In Gustafson , the Supreme Court interpreted Section 12 of the Security Act, 15 U.S.C. S 77l, rather than Section 11, and limited its decision to determining what was a "prospectus" under Section 12.[7] Dicta in Gustafson indicate that a suit under Section 12 may only be maintained by a person who purchased the stock in the offering under the prospectus, 513 U.S. at 571-72, but the Court gave no indication that it intended this restriction to apply to Section 11.
 
 
 18
 Dignity relies on the Supreme Court's statements in Gustafson that Section 12 isa companion to Section 11 for its claim that Section 11 applies only to people who purchased their stock in the initial offering. However, while Section 11 and Section 12 are indeed parallel statutes, their wording is significantly different as to who can bring a suit. As already noted, Section 11 permits suit without restriction by "any person acquiring such security." Section 12, by contrast, permits suit against a seller of a security by prospectus only by "the person purchasing such security from him, " thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus. 15 U.S.C. S 77l(a)(2) (emphasis added).
 
 
 19
 Congress's decision to use "from him" in Section 12 but not in Section 11 must mean that Congress intended a different meaning in the two sections. See Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted). Further, there is nothing in the reasoning or underlying logic of Gustafson that indicates that we should read into Section 11 the express privity requirement of Section 12.
 
 
 20
 Other circuits that have addressed this issue agree with our reading of the text and have uniformly allowed for recovery by purchasers in the aftermarket. Versyss Inc. v. Coopers and Lybrand, 982 F.2d 653, 657 (1st Cir. 1992), cert. denied, 508 U.S. 974 (1993) (Section 11 "is remarkably stringent where it applies, readily imposing liability on ancillary parties to the registration statement (like accountants) for the benefit even of purchasers after the original offering") (emphasis added); Barnes, supra, 373 F.2d 269 (2d Cir. 1967); Columbia General Inv. Corp. v. SEC, 265 F.2d 559, 562 (5th Cir. 1959) ("Persons other than those who purchase the new stock under the Registration may be affected in point of fact and may, under certain circumstances, have remedies in point of law for misrepresentations in a Registration"). We are unaware of any circuit that in light of Gustafson has either reconsidered its view or has disagreed with the circuits that have previously decided the question. Two district courts, in addition to the district court in this case, have read Gustafson in the manner suggested by Dignity, see Gould v. Harris, 929 F.Supp. 353, 358-59 (C.D. Cal. 1996); Gannon v. Continental Insurance Co., 920 F.Supp. 566 (D. N.J. 1996), but for the reasons given above, we believe they have misread both Gustafson and Section 11.
 
 
 21
 Where the meaning of a statute is clear from the text, we need look no further. In re: Kelly, supra, 841 F.2d at 912. However, we note that even if we were to find the wording of the statute ambiguous, the legislative history supports Hertzberg's reading of Section 11.
 
 
 22
 The House Report accompanying the version of the bill that ultimately became the Securities Act of 1933 provides:
 
 
 23
 the civil remedies accorded by [Section 11] are given to all purchasers . . . regardless of whether they bought their securities at the time of the original offer or at some later date, provided, of course, that the remedy is prosecuted within the period of limitations provided by section 13.
 
 
 24
 H.R. Rep. No. 73-85, at 22 (emphasis added). By expressly referring to purchasers who bought their securities "at some later date" other than "at the time of the original offer," the Report makes it clear that purchasers in the aftermarket are intended to have a cause of action under the Section. Similarly, when Congress amended Section 11 in 1934 to add a requirement of proof of reliance on the registration statement if there had been an intervening earning statement, the House Report stated:
 
 
 25
 The basis of this provision is that in all likelihood the purchase and price of the security purchased after publication ofsuch an earning statement will be predicated upon that statement rather than upon the information disclosed upon registration.
 
 
 26
 H.R. Rep 73-1838 at 41. By referring to purchases after publication of an earning statement, the Report makes clear that purchasers in the aftermarket are within the group of purchasers provided a cause of action by Section 11.
 
 
 27
 Dignity does not effectively counter this legislative history. Rather, it points to comments made regarding an alternate bill which was never enacted, S. 875. This circuit relies on official committee reports when considering legislative history, not stray comments by individuals or other materials unrelated to the statutory language or the committee reports. In re: Kelly, supra, 841 F.2d at 912 n.3; see also Garcia v. United States, 469 U.S. 70, 76 (1984). Dignity also cites pieces of the legislative history that show Congress meant Section 11 to deal with new offerings of securities. But that issue has never been in dispute. As discussed above, all the stock ever publicly issued by Dignity was sold in the single offering at issue in this case. The difficulties of tracing stock to a particular offering present in some cases are thus not present here.
 
 
 28
 Finally, we note that the Securities and Exchange Commission has filed an amicus brief supporting Hertzberg's reading of Section 11. Generally, we afford deference to the Commission's interpretation of the federal securities laws as long as that interpretation is "reasonable." See Alderman v. SEC, 104 F.3d 285, 288 (9th Cir. 1997). Such deference is clearly appropriate where the Commission's interpretation is contained in formal regulations that constitute the considered opinion of the agency. Id. Where an agency expresses its interpretation in a position taken in the course of litigation rather than in a regulation, deference is usually not appropriate. Bowen v. Georgetown University Hosp., 488 U.S. 204, 208 (1988). However, we make an exception to the denial of deference where, as here, the agency's interpretation is expressed in an amicus brief. Such an interpretation "is in no sense a `post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action from attack, " but rather may "reflect the agency's considered judgment on the matter in question." Auer v. Robbins, 519 U.S. 452, 462 (1997) (citation omitted).
 
 
 29
 Since Hertzberg had standing to bring an action under Section 11, we need not reach the issue of whether the statute of limitations was tolled for Steinberg, the proposed replacement class representative.
 
 
 30
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.
 
 
 [2]
 Steinberg, et al. v. Dignity Partners, Inc., et al., Civ. No. 98643 (San Francisco Superior Court).
 
 
 [3]
 The district court ruled from the bench and did not issue a written decision, so we are not certain where it got the 25-day period. Such a 25-day period was most likely borrowed from the 25-day after-market period of 17 C.F.R. S 230.174. However, this section pertains to false statements in prospectuses (a Section 12 violation), not registration statements (a Section 11 violation). We note that defendant does not seriously argue in support of the 25-day period. Rather, it argues that any after-market purchase is excluded from the protection of Section 11, whether made one day or 26 days after the initial public offering.
 
 
 [4]
 If there is a mixture of pre-registration stock and stock sold under the misleading registration statement, a plaintiff must either show that he purchased his stock in the initial offering or trace his later-purchased stock back to the initial offering. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 286 (3d Cir. 1992); Barnes, supra, 373 F.2d at 273 n.2; Guenther v. Cooper Life Sciences, Inc., 759 F.Supp. 1437, 1441 (N.D. Cal. 1990).
 
 
 [5]
 The statute of limitations requires a suit to be brought either one year from discovery of the misstatements or three years from the date of the registration, whichever is earlier. 15 U.S.C. S 77m.
 
 
 [6]
 Dignity suggests that a purchaser in the initial offering might pay more than the offering price if she was the victim of an unscrupulous broker. This reading is strained, to say the least. Among other weaknesses, it makes the unlikely assumption that Congress chose to prevent victims of broker fraud from recovering the additional amount out of which they were cheated.
 
 
 [7]
 Specifically, the Supreme Court held that a private sales agreement executed 20 years after the issuance of the stock was not a prospectus.