**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

JACK JOSEPH,

      Plaintiff-Appellant,

v.

Q.T. WILES; GERALD W. GOODMAN;
WILLIAM R. HAMBRECHT; GARY E. KOENIG;
RUSSELL E. PLANITZER; PAUL N. RISINGER;
PATRICK J. SCHLEIBAUM, JESSE C. PARKER;
OWEN TARANTA; HAMBRECHT & QUIST
GROUP; HAMBRECHT & QUIST VENTURE
PARTNERS; HAMBRECHT & QUIST, INC.,
named as Hambrecht & Quist Incorporated;
MORGAN STANLEY & CO. INCORPORATED;
COOPERS & LYBRAND, and Does 1 through 50,

      Defendants-Appellees,

No. 99-1258

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 91-M-731)

---

Solomon B. Cera of Gold Bennett & Cera LLP, San Francisco, California (Gary
Garrigues and Steven J. Mulligan of Gold Bennett & Cera LLP, San Francisco,
California; and Frances A. Koncilja of Koncilja & Associates, P.C., Denver,
Colorado, with him on the briefs for Plaintiff-Appellant.

Geoffrey F. Aronow of Arnold & Porter, Washington, D.C., and Robert F. Wise,
Jr. of Davis Polk & Wardwell, New York, New York (Tim Atkeson and Robert
Barrett of Arnold & Porter, Denver, Colorado; Marcy G. Glenn of Holland & Hart

LLP, Denver, Colorado; Michael V. Corrigan of Simpson Thacher & Bartlett, New York, New York; Gerald L. Bader, Jr. of Bader & Associates, P.C., Denver, Colorado; John Sullivan of Kirkpatrick & Lockhart, New York, New York; Richard Gabriel of Holme, Roberts & Owen, Denver, Colorado; Cary B. Lerman of Munger, Tolles & Olsen, Los Angeles, California; and H. Alan Dill of Dill, Dill, Carr & Stonbraker, P.C., Denver, Colorado, with them on the brief) for Defendants-Appellees.

---

Before **SEYMOUR**, Chief Judge, **LUCERO,** Circuit Judge and **ELLISON,** District Judge.[*]

---

**SEYMOUR**, Chief Judge.

---

In this securities class action suit in the District Court of Colorado, Jack Joseph asserts claims on behalf of himself and others similarly situated pursuant to section 11 of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77k, and section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b). Defendants prevailed on their motions to dismiss in the district court. On review, we are asked to determine whether a variety of threshold, procedural, and pleading issues prevent plaintiff's claims from going forward. We affirm in part, and reverse and remand in part.

---

[*]The Honorable James O. Ellison, District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

## I

The background of this case is complex and involves a prodigious amount of litigation. We therefore set forth only those facts relevant to the disposition of the matter at hand.

On May 21, 1987, MiniScribe Corporation (MiniScribe or the Company), a manufacturer of computer hard disk drives, sold over $97 million worth of convertible debentures in a public offering. These debentures were issued pursuant to a registration statement filed with the Securities and Exchange Commission (SEC). Jack Joseph purchased 250 of the debentures later that year.

In March of 1989, MiniScribe announced that, due to irregularities in its business and accounting practices, its prior financial statements could not be relied upon. Mr. Joseph sold his debentures at a loss of approximately $17,000 in June 1989. An Independent Evaluation Committee report issued the following September disclosed widespread intentional fraud at MiniScribe going back several years, which had resulted in material overstatements of revenues and earnings. In late 1989 the Company revealed that it had a negative net worth of $88 million, and in 1990 it filed for Chapter 11 bankruptcy.

A series of lawsuits was commenced against MiniScribe, its principal officers and directors, venture capital firms that had major investments in the Company, its outside auditors, and the underwriters of the debentures. The first

suit brought by debenture holders was a class action filed in federal district court in Colorado on April 5, 1989, asserting claims under section 10(b) but not under section 11.  Another action was filed in California state court on May 9, 1989, asserting state law claims as well as claims under section 11.  Although this action was filed on behalf of all MiniScribe securities purchasers, it contained no named plaintiffs who had purchased debentures.  On November 1, 1989, the complaint was amended to omit the claims under section 11.

On October 4, 1989, a Coordinated Amended Complaint was filed in a new action in federal district court in Colorado on behalf of common stock and debenture purchasers, asserting claims under both section 10(b) and section 11.  The plaintiffs in that action moved to certify classes of shareholders and debenture purchasers.  The district court held a hearing on those motions on June 15, 1990.  During this hearing the court indicated it was not prepared at that time to certify a debenture class, but agreed to allow the debenture holders thirty days to file a separate amended complaint.[1]  In October 1990, pursuant to the June 15 hearing, the district court certified a shareholder-only class in a related action, *Gottlieb v. Wiles*, No. 89-M-963 (D. Colo. 1990).

In the meantime, on August 10, 1990, another complaint was filed in state

---

[1]It does not appear from the record that such an amended complaint was filed with the district court.  The record contains no explanation for this failure.

court in California asserting claims under section 11 on behalf of all purchasers, with Mr. Joseph as a named plaintiff. It was subsequently removed and transferred to the federal district court in Colorado. In June 1991, Mr. Joseph moved to certify the class. On October 24, the district court denied Mr. Joseph's motion on the grounds that, as an aftermarket purchaser, he lacked standing to pursue a section 11 claim, and that his class claims were barred in any event by the statute of repose.

The shareholder action settled in 1993, and on June 3, 1994, the district court held a hearing in which he ordered any remaining debenture purchasers to file their claims in the MiniScribe litigation. On July 5, 1994, Mr. Joseph filed an amended complaint in the present action, asserting claims under section 10(b) and section 11. Defendants moved to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). In 1999, the district court granted the motions in a brief order, summarily concluding that the claims were untimely and that the allegations in Mr. Joseph's complaint would not be sufficient for class certification in any event. Mr. Joseph appeals.

We review de novo a district court's decision to dismiss a complaint under Rule 12(b)(6). *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).

## II

Mr. Joseph's arguments on appeal are directed at several different points: the district court's conclusion in its October 24, 1991 order that Mr. Joseph lacked standing under section 11 because he was an aftermarket purchaser; defendants' contention in their Rule 12(b)(6) motions that Mr. Joseph failed to allege reliance as required for his section 10(b) claim; and, finally, the timeliness of his claims. Specifically, Mr. Joseph argues first that the district court erred in determining he lacked standing as an aftermarket purchaser to assert claims under section 11. Second, Mr. Joseph contends he is entitled to a presumption of reliance sufficient to sustain his claim under section 10(b). Finally, he asserts that his claims were timely filed because he is entitled (1) to a tolling of the limitations period on his claims while class certification was pending, and (2) to the relation-back of his 10(b) claims to the August 10, 1990, state court complaint. We address each issue in turn.

### A.  *Standing Under Section 11 for Aftermarket Purchasers*

Section 11 provides that where a material fact is misstated or omitted from a registration statement accompanying a stock filing with the SEC, "any person acquiring such security" may bring an action for losses caused by the misstatement or omission. 15 U.S.C. § 77k(a). Defendants argue Mr. Joseph

-6-

lacks standing to pursue his section 11 claim because he purchased his debentures in the secondary market. The district court agreed in its 1991 opinion denying Mr. Joseph's motion for class certification, holding that "[s]ection 11 is limited to the initial distribution of securities." Rec., vol. II at 608. The court concluded that Mr. Joseph's class could not be certified because he would be unable to represent those members who bought their debentures in the initial distribution.

We have not previously had occasion to determine whether aftermarket purchasers have standing to sue under section 11, a question which is vigorously debated. Both parties cite us to numerous district court opinions which have come down on both sides of the controversy. *Compare In re Summit Med. Sys., Inc.*, 10 F. Supp. 2d 1068, 1070 (D. Minn. 1998) (holding aftermarket purchasers lacked standing under section 11) *and Gannon v. Continental Ins. Co.*, 920 F. Supp. 566, 575 (D.N.J. 1996) (same) *with Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 130-33 (S.D.N.Y. 1998) (holding aftermarket purchasers had standing under section 11) *and Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 555-57 (D. Colo. 1998) (same). The federal courts of appeal addressing this issue have agreed that section 11 covers aftermarket purchasers. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999); *Versyss, Inc. v. Coopers & Lybrand*, 982 F.2d 653, 654 (1st Cir. 1992); *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967). Defendants contend the Supreme Court, in construing another section

of the 1933 Act, indicated that the opposite result is correct. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) (construing § 12(2)).

After considering the statutory language, legislative history, analogous Supreme Court authority, and case law from other circuits, we are convinced that Mr. Joseph has the better argument. For the reasons set out below, we conclude that an aftermarket purchaser has standing to pursue a claim under section 11 so long as he can prove the securities he bought were those sold in an offering covered by the false registration statement.

In determining the meaning of a statute, we look first to its text. *See O'Connor v. United States Dept. of Energy*, 942 F.2d 771, 773 (10th Cir. 1991) (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)). Section 11(a) provides that where a registration statement containing material misstatements or omissions accompanies a stock filing with the SEC, "any person acquiring such security" may bring an action for losses caused by the defect. 15 U.S.C. § 77k(a). The problem, as Judge Friendly pointed out, "is that 'such' has no referent." *Barnes*, 373 F.2d at 271. Nothing indicates whether "such security" must be one sold in the initial offering or whether it could have been sold in the aftermarket. The term "any person," however, is quite broad. According to Black's Law Dictionary, "any" means "some; one out of many; an indefinite number." Black's Law Dictionary 94 (6th ed. 1990). "Its generality," Black's points out, "may be

restricted by the context." *Id.* When these two clauses are combined and read together, the natural reading of "any person acquiring such security" is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement. *See Hertzberg*, 191 F.3d at 1080. There is no language limiting claims to those investors who purchase their shares in a public offering.

Other portions of section 11 buttress our interpretation of the statute. Section 11(a) was amended in 1934 to add the requirement that a person who acquires the security "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement" must prove reliance on the registration statement in order to recover. This legislative provision indicates that aftermarket purchasers may assert claims pursuant to section 11. To construe section 11 as inapplicable to registered securities purchased in the secondary market would make this section applicable only to continuous offerings that extend beyond twelve months, which are (and were in 1933) the exception rather than the rule. *See* Harold S. Bloomenthal, *Securities Law Handbook* § 14.08[1] at 704 (2000 ed.).

The damages provision, section 11(e), clearly contemplates that some buyers will not have purchased their securities in the initial offering. It sets the

baseline for measuring damages at "the amount paid for the security (not exceeding the price at which the security was offered to the public)." 15 U.S.C. 77k(e). Section 11(g) further caps the maximum amount recoverable at "the price at which the security was offered to the public." *Id.* at 77k(g). Such provisions "would be unnecessary if only a person who bought in the actual offering could recover, since, by definition, such a person would have paid 'the price at which the security was offered to the public.'" *Hertzberg*, 191 F.3d at 1080. Indeed, aftermarket purchasers who pay more than the offering price for their securities are the only people who could have losses which exceed the price at which the securities were offered to the public. *See* Bloomenthal, at 704.

As is often the case with legislative history, we can find passages to support both positions. For example, a legislative report accompanying the bill states that "the civil remedies accorded by [section 11] . . . are given to all purchasers . . . regardless of whether they bought their securities at the time of the original offer or at some later date." H.R. Rep. No. 73-85, at 22 (1933). However, that same report also states: "The bill only affects new offerings of securities . . . . It does not affect the ordinary redistribution of securities." *Id.* at 5. This only demonstrates how "legislative history often cuts both ways and a researcher can find a bit here and there which supports a desired view." *United States v. Richards*, 583 F.2d 491, 495 (10th Cir. 1978).

Defendants urge us to view the statutory scheme broadly and to recognize the fundamental dichotomy between the purpose and scope of the 1933 Act, which was meant to regulate the initial distribution of securities, and the 1934 Act, which regulates trading in the open market. *See*, *e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975) ("The 1933 Act is a far narrower statute [than the 1934 Act,] chiefly concerned with disclosure and fraud in connection with offerings of securities–primarily . . . initial distributions of newly issued stock from corporate issuers.") (citing I L. Loss, *Securities Regulation*, 130-31 (2d ed. 1961). Recognizing this difference, however, does not lead us to change our conclusion. This distinction centers on where the misstatement or omission takes place, in the public offering or in the secondary market. Here, Mr. Joseph may have purchased in the aftermarket, but the alleged deception took place in the initial offering. *See Columbia Gen. Inv. Corp. v. SEC*, 265 F.2d 559, 562 (5th Cir. 1959) ("Persons other than those who purchase new stock under the Registration may be affected in point of fact and may, under certain circumstances, have remedies in point of law for misrepresentations in a Registration."). It does not do violence to the scope and purpose of the 1933 Act to allow Mr. Joseph, under these circumstances, to bring a claim under section 11.

This is the logic underlying the "tracing" theory, which recognizes aftermarket purchasers' standing to sue under section 11 as long as they can

demonstrate they bought their securities pursuant to the registration statement. *See Barnes*, 373 F.2d 269. Several circuit and district courts have endorsed this theory, *see Hertzberg*, 191 F.3d at 1080 n.4; *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992); *Adair*, 179 F.R.D. at 130; *Schwartz*, 178 F.R.D. at 556. *See also* IX Louis Loss & Joel Seligman, *Securities Regulation* 4267 n.180 (3d ed. 1995); Bloomenthal, at 700-01, and we are persuaded by the weight of reasoned authority to endorse it. Because MiniScribe made only one debenture offering, the debentures Mr. Joseph purchased are directly traceable to the May offering and registration statement. *See Hertzberg*, 191 F.3d at 1082 (noting that, because all stock issued was sold in a single offering, plaintiff would have no difficulty tracing his stock to the offering).

Defendants believe that their interpretation of section 11 is supported by the Supreme Court's ruling in *Gustafson*. We do not agree. *Gustafson* involved neither a public offering nor the issue of standing of an aftermarket purchaser. Rather, the Court was interpreting section 12(2) of the 1933 Act, which gives buyers a cause of action for recission against sellers who make material misstatements or omissions "by means of prospectus." 15 U.S.C. § 77*l*(a)(2). In that case individuals who were the sole shareholders of a privately held corporation entered into a contract to sell their shares to another party. When the company's actual earnings turned out to be lower than its estimated earnings, the

-12-

buyer sued for recission, arguing that the contract of sale was a "prospectus" and therefore any misstatements contained in it gave rise to liability under section 12(2). The Court held that a private contract is not an offering document within the meaning of that section, and indicated in dicta that only purchasers in the initial public offering could bring suit pursuant to section 12(2). *See Gustafson*, 513 U.S. at 571-72. Defendants contend this dicta implies the Court would also interpret section 11 to apply only to purchasers in the initial offering.

This argument is unavailing, however, because the wording of the two provisions is distinctly different. Section 12(2) provides that any person who offers or sells a security by means of a prospectus which contains an untrue material statement or omits a material fact is liable "to the person purchasing such security *from him*." 15 U.S.C. 77*l*(a) (emphasis added). This is an express privity requirement, giving a cause of action only to individuals who purchase securities directly from a person who sells the securities by means of a prospectus. Section 11, in contrast, has no such requirement. It gives a cause of action to "*any* person acquiring such security." 15 U.S.C. 77k(a) (emphasis added); *see also* Loss & Seligman, at 4267 ("It is in its assault on the citadel of privity that 11 marks its greatest departure from precedent. . . . [Section 11] gives the same right of action even to a buyer in the open market."). We must assume that Congress intended the two sections to be interpreted differently. "[W]here Congress includes

particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Burch*, 202 F.3d 1274, 1277 (10th Cir. 2000) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The available scholarly literature supports our construction of section 11. The author of a recent article states:

> Following an initial flurry of decisions after *Gustafson* which limited standing under section 11 to purchasers on an IPO, the more recent and more well-reasoned decisions allow aftermarket purchasers standing to sue under section 11. Such decisions are not only consistent with both the explicit statutory language of section 11 . . . but, are also truer to the legislative spirit behind the Securities Act in providing the broadest possible protection to purchasers of initial public offerings.

Brian Murray, *Aftermarket Purchaser Standing Under 11 of the Securities Act of 1933*, 73 St. John's L. Rev. 633, 650 (1999). *See also* Loss & Seligman, at 4249 ("Suit may be brought by any person who acquired a *registered* security, whether in the process of distribution or in the open market."); Bloomenthal, at 700 ("Anyone who purchased the registered security can assert a claim. S/he does not have to purchase the security at the time it was offered."); Vincent R. Cappucci, *Misreading Gustafson Could Eliminate Liability Under Section 11*, 218 N.Y. L.J. 1 (Sept. 22, 1997).

For all of these reasons, we hold that Mr. Joseph has standing to bring suit

under section 11.

### B.  Presumption of Reliance Under Section 10(b)

In order to state a claim under section 10(b), a plaintiff must establish that, "in connection with the purchase or sale of a security, 'the defendant, with scienter, made a false representation of a material fact upon which the plaintiff justifiably relied to his or her detriment.'" *Grubb v. FDIC*, 868 F.2d 1151, 1162 (10th Cir. 1989) (quoting *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1516 (10th Cir. 1983)).  Reliance is an element of the section 10(b) cause of action because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988).  Defendants correctly point out that Mr. Joseph's complaint fails to sufficiently allege reliance.  This need not prove fatal to his claim, however, if the circumstances of his debenture purchase bring him within any of the recognized exceptions to the reliance requirement entitling him to a rebuttable presumption of reliance.  Mr. Joseph contends he is entitled to a presumption of reliance under several theories.

#### 1. Affiliated Ute Presumption

Mr. Joseph first asserts he is entitled to a presumption of reliance under

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), based on allegations in the complaint that defendants failed to disclose material facts. Requiring a plaintiff to show a speculative state of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff. Consequently, the Supreme Court has allowed the trier of fact to presume reliance where the defendant fails to disclose material information. *See id.* at 153-54. The defendants in *Affiliated Ute* were two officers of the bank which was the transfer agent for a tribal corporation that managed and distributed assets to members of the Ute Native American Tribe. The bank officers induced tribal members to sell their stock at below-market rates. Unbeknownst to the Utes, the officers purchased a significant number of shares themselves and arranged sales to non-Native American investors, for which they received gratuities and commissions. The Court found the Utes had the right to know that the bank officers were in a position to gain financially from sales of the stock and that the stock was selling at a higher price in the market the officers had developed. The duty to disclose and the withholding of these material facts established the requisite element of causation. *See id.* at 154.

*Affiliated Ute's* holding is limited to omissions as opposed to affirmative misrepresentations. Defendants correctly point out that Mr. Joseph's complaint alleges at most a combination of misrepresentations and omissions. In such

-16-

"mixed" cases, "[a] strict application of the omissions-misrepresentations dichotomy would require the trial judge to instruct the jury to presume reliance with regard to the omitted facts, [but] not to presume reliance with regard to the misrepresented facts." *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981). Rather than subject the jury to such a confounding exercise, "a unitary burden of proof on the reliance issue should be set according to a context-specific determination of where that burden more appropriately lies." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 202 (3d Cir. 1990). *See also Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *Austin v. Loftsgaarden*, 675 F.2d 168, 178 n.21 (8th Cir. 1982); *Sharp*, 649 F.2d at 188. We must therefore analyze the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption should apply.

This analysis is easier to describe than to carry out because every misstatement both advances false information and omits truthful information. Statements which are technically true may be so incomplete as to be misleading (e.g., half-truths or distortions). In an attempt to take advantage of the *Affiliated Ute* presumption, an artfully-pleaded complaint can recharacterize as an omission conduct which more closely resembles a misrepresentation. "The labels by themselves, therefore, are of little help." *Wilson v. Comtech Telecomm. Corp.*,

-17-

648 F.2d 88, 93 (2d Cir. 1981).

Instead we look to the nature of the allegations contained in the complaint, bearing in mind that the *Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove. *See Wilson*, 648 F.2d at 93. Mr. Joseph's complaint essentially alleges that MiniScribe engaged in a pattern of deception which involved manipulating financial data, disseminating false information about the company, concealing the truth about the company's true financial outlook, and hiding the existence of the fraudulent scheme itself. The claims are pled in such a manner as to intertwine affirmative acts with omissions in a strained attempt to recharacterize the alleged wrongdoing. The following allegations, typical of those contained in Mr. Joseph's complaint, are illustrative:

> [MiniScribe] consistently *omitted to disclose that its financial statements had been falsified* and that its sales, revenues, assets and shareholders' equity had been artificially inflated. *Defendants concealed the existence of the unlawful scheme and the acts of manipulation committed pursuant thereto.* In furtherance of this campaign of concealment, [MiniScribe] continually reported in its public statements that it had achieved, and would continue to achieve, substantial growth in revenue and profits. *These statements . . . were materially false and misleading in that they failed to disclose the existence of the fraudulent scheme . . . .*

Rec., vol. II at 692 (emphasis added). Statements such as these, while struggling valiantly to bring the alleged conduct within the definition of "omission," indicate that what Mr. Joseph really protests are the affirmative misrepresentations

-18-

allegedly made by defendants.

Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely. Moreover, it would fail to serve the *Affiliated Ute* presumption's purpose since this is not a case where reliance would be difficult to prove because it was based on a negative. We therefore hold the *Affiliated Ute* presumption of reliance inapplicable here. *See Abell v. Potomic Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988) (applying the presumption in non-disclosure cases, but not in falsehood or distortion cases), *judgment vacated on other grounds*, 492 U.S. 914 (1989).

### 2. *Fraud-Created-the-Market Presumption*

Mr. Joseph contends that in any event he is entitled to a presumption of reliance under the "fraud-created-the-market" doctrine, which permits a plaintiff to maintain an action under section 10(b) by proving the defendant's fraud allowed securities that otherwise would have been unmarketable to come into and

exist in the market.[2]  In other words, investors can be presumed to rely on the integrity of the market to contain only genuine securities.  The first case to articulate this doctrine was *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (en banc).  The defendants there had engaged in an elaborate scheme to create a bond issue so lacking in basic requirements it would never have been approved absent the massive fraud.  *See id.* at 464 n.2.  The Fifth Circuit stated that the plaintiff would be entitled to a presumption of reliance if he could establish that "the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers."  *Id.* at 469.  The court made clear that the plaintiff could not recover if he "proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed."  *Id.* at 470.

This court explicitly adopted the reasoning of *Shores* in *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.*, 717 F.2d 1330, 1333 (10th

---

[2]This presumption of reliance is not to be confused with its more established cousin, the "fraud-on-the-market" presumption.  The latter doctrine, endorsed by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988), recognizes that in an open, efficient, and developed market, where millions of shares are traded daily, the investor must rely on the market to perform a valuation process which incorporates all publicly available information, including misinformation.  *See id.* at 241-47.  Thus, the reliance of individual plaintiffs on the integrity of a price in such a market, and implicitly the misinformation that contributed to that price, may be presumed.  *See id.* at 247.  The fraud-created-the-market presumption, by contrast, applies where there is no preexisting, well-established market.

Cir. 1983).  The defendant in *T.J. Raney* issued bonds for the construction of a gas distribution facility.  The offering circular was deceptive, the bond proceeds were mishandled, and the bonds went into default.  The trial court found that the defendant was not a valid public trust and, as such, was actually prohibited from issuing bonds under state law.  We noted that "the securities could not have been issued" but for the fraud, and held that the plaintiff had "reasonably relied on the availability of the bonds as indicating their lawful issuance." *Id.*  We also made clear the limitations of the doctrine:

> This holding does not imply in any way that the regulatory body considers the worth of the security or the veracity of the representations made in the offering circular . . . .  It merely extends the protection of Rule 10b-5 to those cases in which the securities were not qualified legally to be issued.

*Id.*  Thus, we require the securities to be unmarketable in order to invoke the presumption of reliance based on fraud creating the market.

Cases discussing the issue define "unmarketable" strictly.  The Sixth Circuit breaks the term into two categories: (1) "economic unmarketability," which occurs when a security is patently worthless, and (2) "legal unmarketability," which occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security. *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1160 (6th Cir. 1994).  *Cf. Ross v. Bank South*, 885 F.2d 723, 729 (11th Cir. 1989) (en banc) ("[T]he fraud must be so pervasive that it goes to the very existence of the bonds and the validity of

their presence on the market.").

Mr. Joseph does not argue that his debentures lacked all economic value. Although he suffered a substantial loss, the record indicates Mr. Joseph was able to sell the debentures for $8,147. *See* Rec., vol. II at 725. If we adhere to a strict definition of economic unmarketability, he should not be entitled to a presumption of reliance. *See Rosenthal*, 945 F. Supp. at 1418-19 (refusing to apply doctrine where plaintiff's bonds "had some economic worth"); *Bank of Denver v. Southeastern Capital Group, Inc.*, 763 F. Supp. 1552, 1558 (D. Colo. 1991) (plaintiff must prove that securities "would not have been offered on the market at any price").

Even if we look to the slightly different definition of economic unmarketability advanced in *Abell*, 858 F.2d at 1122, Mr. Joseph remains unsuccessful.[3] *Abell* recognized that "saleable assets may bless even the most worthless enterprise," and allowed investors a presumption of reliance if "the enterprise itself was patently worthless," illegitimate, or a sham. *Id.* In this case, Mr. Joseph alleges that MiniScribe engaged in fraudulent business and accounting practices, eventually declaring bankruptcy, and that several of the defendants pled

---

[3]There is more than one definition of "economic unmarketability" being used by the federal courts. Because we conclude that Mr. Joseph's debentures do not meet either definition of economic unmarketablity, we need not determine which of these definitions is preferable.

-22-

guilty to criminal securities violations. While all of these charges indicate that MiniScribe was a seriously troubled enterprise, they do not lead to the conclusion that MiniScribe was an illegitimate or sham business.

Nor does Mr. Joseph claim the debentures were issued without lawful authority and therefore legally unmarketable. Instead, he alleges that, "[h]ad the adverse facts defendants concealed been disclosed, the public offering of MiniScribe's debentures in May 1987 would not have been possible." Rec., vol. II at 708. Mr. Joseph merely seems to be advancing the unremarkable proposition that the investors would not have bought MiniScribe securities if they had known about the Company's economic problems. Applying the fraud-created-the-market doctrine in this situation would require us to ignore the limitations we placed on it in *T.J. Raney*.[4] There is a significant difference between securities which should not be marketed because they involve fraud, and securities which cannot be marketed because the issuers lack legal authority to offer them. Mr. Joseph's allegations only encompass the former scenario. Because he has not alleged that his debentures were economically or legally unmarketable, Mr. Joseph is not

---

[4]Indeed, by this logic every securities offering involving fraud would qualify for the presumption because "[w]ho would knowingly roll the dice in a crooked crap game?" *Schlanger v. Four-Phase Sys., Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982).

entitled to this presumption of reliance.[5]

### 3. Reliance on the Regulatory Process

Mr. Joseph next cites to *Arthur Young & Co. v. United States District Court*, 549 F.2d 686 (9th Cir. 1977), for the proposition that he was entitled to rely on the integrity of the regulatory process. In that case, the Ninth Circuit held:

> Just as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market to reflect the true value of securities in which he invests, so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue.

*Id.* at 695.[6] Thus, this doctrine suggests that an investor is justified in relying on the regulatory process, and the accuracy of any documents filed in connection with the offering, to ensure the legitimacy of an offering price.

Defendants correctly point out that while our opinion in *T.J. Raney* mentioned *Arthur Young*, it did not adopt or apply its reasoning because it decided the issue based on the fraud-created-the-market doctrine. There are no

---

[5]Defendants also argue that, as an aftermarket purchaser, Mr. Joseph is not entitled to the fraud-created-the-market presumption of reliance. Because we dispose of the matter on other grounds, we need not address this issue.

[6]This language raises the question of whether this presumption of reliance can apply to someone who purchased in the aftermarket. Because we decline to recognize the presumption, we need not explore its contours.

other cases in the Tenth Circuit that even mention *Arthur Young* or its doctrine of reliance on the regulatory process. In fact, only a few cases, all either in the Ninth Circuit or its district courts, have applied the doctrine, and many of those courts apply it reluctantly. *See In re Jenny Craig Sec. Litig.*, No. 92-0845-IEG, 1992 WL 456819 at *5, Fed. Sec. L. Rep. (CCH) P 97,337 (S.D. Cal. 1992) ("[A]lthough it has been widely criticized, the doctrine does not appear to have been overruled, and this Court is bound to follow it where applicable."); *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1372 (N.D. Cal. 1987) ("Although *Arthur Young* has been criticized . . . it is still binding law upon this Court until expressly vacated or reversed."). *But see American Continental Corp. v. Keating*, 140 F.R.D. 425, 434 (D. Ariz. 1992) (applying the doctrine where a series of misrepresentations to federal and state regulators enabled bond sales to proceed).

The problem with this presumption of reliance is that it appears to create a form of investor's insurance, expanding the SEC's role beyond its intended or realistic scope. The SEC does not read all of the publicly available information about an offering and then determine the legitimate price for the security. *See Eckstein v. Balcor Film Investors*, 740 F. Supp. 572, 582 (E.D. Wis. 1990). Nor does the SEC endorse any of the documents involved in the issuance of securities. In fact, regulations in force today, and in 1987 when Mr. Joseph purchased his debentures, require offerors of stock under a Securities Act prospectus to state "in

capital letters printed in bold-face" that:

> **THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

17 C.F.R. § 229.501(c)(5) (1987). That defendants filed a misleading document with a regulatory agency does not lend any more credibility or veracity to the document than if they had simply given the document to investors. *See* Note, *The Fraud-on-the-Market Theory*, 95 Harv. L. Rev. 1143, 1158 (Mar. 1982) ("[A]ny argument about an expectation fostered by SEC regulation is severely undermined by the fact that the SEC does not vouch for either the substantive value of any issue or the veracity of the representations by any issuer."). It is therefore not sufficient for an individual to claim reliance on this process. We decline to adopt the reasoning of *Arthur Young* and its sweeping presumption of reliance.

In sum, we hold that Mr. Joseph has not sufficiently alleged reliance to make out a section 10(b) claim and he is not entitled to any presumption of reliance. The district court therefore did not err in dismissing Mr. Joseph's section 10(b) claim.

## C. *Timeliness*

Given our conclusion in Part A, *supra*, that Mr. Joseph has standing to

pursue his section 11 claim, we turn to the issue of timeliness.[7]  Section 13 of the 1933 Act requires a section 11 claim to be filed within one year from the time the violations are or should have been discovered, but in no event more than three years after the security was initially offered to the public.  *See* 15 U.S.C. § 77m. As such, it is a statute of limitations framed by a statute of repose.  *See Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1196 (10th Cir. 1998).  Defendants argue that Mr. Joseph's section 11 claim is untimely because it was filed on August 10, 1990, almost three months after the repose period ran out on May 21, 1990.  Mr. Joseph's action was timely filed only if the repose period was tolled.

Mr. Joseph contends that either the filing of the May 9, 1989 class action complaint in California state court, or the October 4, 1989 filing of the Coordinated Amended Complaint in federal district court in Colorado, tolled the repose period for his section 11 claim.  Defendants disagree, relying heavily on *Lampf v. Gilbertson*, 501 U.S. 350, 363 (1991),[8] and *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1434-35 (10th Cir. 1991), *vacated on other grounds sub nom. Dennler v. Trippet*, 503 U.S. 978 (1992), which hold that equitable tolling does not apply to statutes of repose.

---

[7]Having determined that Mr. Joseph's section 10(b) claims fail due to a lack of reliance or presumption of reliance, we need not address his arguments for avoiding the statute of limitations governing those claims.

[8]In *Lampf*, the Supreme Court applied the one year/three year structure to claims under section 10(b).  *See* 501 U.S. at 363.

*Lampf* and *Anixter* are not relevant in the present context because the tolling that Mr. Joseph seeks is legal rather than equitable in nature. Equitable tolling is appropriate where, for example, the claimant has filed a defective pleading during the statutory period, *see Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 434-36 (1965), or where the plaintiff has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass, *see Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231 (1959). In contrast, the tolling Mr. Joseph claims is the legal tolling that occurs any time an action is commenced and class certification is pending.[9] *Cf. Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) (tolling no longer appropriate after court ruled definitively to deny class certification).

The Supreme Court addressed this type of tolling in *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974), where it held in the context of a statute of limitation that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to

---

[9]Mr. Joseph correctly points out there was not a definitive determination with regard to class certification for the debenture purchasers on the section 11 claim before he filed this action. In the June 15, 1990 hearing at which the stock purchasers' class was certified, the district court did not officially rule on whether to certify the debenture class. After initially expressing reluctance to certify a debenture class, the court later indicated a desire to leave the question open. *See* Rec., vol. I at 218-19, 229, 232-33. It appears to us that the question of class certification for the debenture purchasers was still pending when the district court dismissed this action.

intervene after the court has found the suit inappropriate for class action status."
*Id.* at 553. The Court expanded this rule in *Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983), to include putative class members who later seek to file
independent actions. *See id.* at 353-54 (statute of limitations remains tolled for
all members of putative class until class certification is denied). *Lampf* did not
overrule or even mention these cases, and we are not persuaded the three are
incompatible. In fact, *Lampf* states that the "litigation . . . must be *commenced*
within one year after the discovery of the facts constituting the violation and
within three years after such violation," indicating that the commencement of the
action is the event which triggers tolling. *Lampf*, 501 U.S. at 364 (emphasis
added).

Tolling the limitations period for class members while class certification is
pending serves the purposes of Rule 23 of the Federal Rules of Civil Procedure
governing class actions. Rule 23 encourages judicial economy by eliminating the
need for potential class members to file individual claims. If all class members
were required to file claims in order to insure the limitations period would be
tolled, the point of Rule 23 would be defeated. *See*, *e.g.*, *American Pipe*, 414
U.S. at 551; *Crown, Cork*, 462 U.S. at 351; *Realmonte v. Reeves*, 169 F.3d 1280,
1284 (10th Cir. 1999). We noted in *Realmonte* that the notice and opt-out
provision of Rule 23(c)(2) would be irrelevant without tolling because the

limitations period for absent class members would most likely expire, "making the right to pursue individual claims meaningless." *Id. See also Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968) (limitations period tolled for all class members, requiring relation back to date of initiation of suit where district court erroneously denied class certification); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1800, at 455 (2d ed. 1986) ("The only logical rule under the present [version of Rule 23] is that the commencement of the class suit tolls the statute for all persons who might be bound by the judgment.") (citing *Esplin*, 402 F.2d 94); *id.* § 1795, at 325 ("If the [class certification] determination is delayed, members of a putative plaintiff class may be led by the very existence of the lawsuit to neglect their rights until after a negative ruling on this question – by which time it may be too late for the filing of independent actions. . . . [T]he possibility of unfairness is obvious.").

Tolling the limitations period while class certification is pending does not compromise the purposes of statutes of limitation and repose. Statutes of limitation are intended to protect defendants from being unfairly surprised by the appearance of stale claims, and to prevent plaintiffs from sleeping on their rights. *See Crown, Cork*, 462 U.S. at 352. "[T]hese ends are met when a class action is commenced." *Id.* In this case, because a class action complaint was filed, defendants were on notice of the substantive claim as well as the number and

-30-

generic identities of potential plaintiffs. Defendants cannot assert Mr. Joseph's claim was stale or that he slept on his rights.

Statutes of repose are intended to demarcate a period of time within which a plaintiff must bring claims or else the defendant's liability is extinguished. Here, the claim was brought within this period on behalf of a class of which Mr. Joseph was a member. Indeed, in a sense, application of the *American Pipe* tolling doctrine to cases such as this one does not involve "tolling" at all. Rather, Mr. Joseph has effectively been a party to an action against these defendants since a class action covering him was requested but never denied. *See, e.g., In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998) (finding statute of repose "legally tolled" while party was a putative class member) (citing *Crown, Cork*, and *American Pipe*). Defendants' potential liability should not be extinguished simply because the district court left the class certification issue unresolved. Consequently, we conclude that *American Pipe* tolling applies to the statute of repose governing Mr. Joseph's action. *See also Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994) (post-*Lampf* case holding statutory limitations tolled for putative class members upon the filing of the class action) (citing *Crown, Cork*, 462 U.S. at 354).

We are not convinced May 9, 1989 is the correct date to toll the repose period for Mr. Joseph's section 11 claim, however, because it does not appear that

the action filed on that date actually represented a class of which Mr. Joseph was a member. The May 9, 1989 class action complaint asserted claims under section 11, but contained no named plaintiffs who had purchased debentures. Moreover, the complaint was amended on November 1 of that year to omit the section 11 claims. We conclude instead that the repose period for Mr. Joseph's section 11 claims was tolled on October 4, 1989, the date the federal Combined Amended Complaint was filed on behalf of both common stock and debenture purchasers, asserting claims under both section 11 and section 10(b). Because this was within the limitations period, this complaint tolled the statute. As a result, Mr. Joseph's section 11 claim was timely filed.

## D. *Certification of Class*

Mr. Joseph also requests that we direct certification of a debenture class pursuant to Rule 23. He argues that the district court's order denying class certification in his case was based on its erroneous conclusions regarding the statute of limitations and his standing to bring suit as an aftermarket purchaser. His brief also sets forth arguments as to why his class meets the requirements of Rule 23. Although we are reversing the dismissal of Mr. Joseph's section 11 claim and remanding for further proceedings, we are not persuaded we should address the class certification issue. The district court's denial of certification

was based on purely procedural grounds. The substance of whether the proposed class satisfied Rule 23's requirements was never ruled upon on the merits and therefore is not properly before us on review.[10] *Cf. J.B. v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999) (decision whether to grant certification of a class is normally within the discretion of the trial court and appellate courts should not interfere unless that discretion has been abused). This is a determination for the district court to make on remand.

### III

To summarize, we conclude that Mr. Joseph has standing as an aftermarket purchaser to pursue his section 11 claim; he has not sufficiently alleged reliance to make out a section 10(b) claim, and he is not entitled to a presumption of

---

[10]When the district court dismissed the action in 1999 it again concluded that the allegations contained in Mr. Joseph's 1994 complaint were not sufficient for class certification. The court indicated it was unwilling to certify a debenture class because it believed that Mr. Joseph was the only potential class member interested in pursuing his claims. The court based this conclusion on the lack of response to its June 4, 1994, interlocutory order requiring remaining debenture purchasers to file a consolidated amended complaint. Apparently, Mr. Joseph was the only plaintiff to do so. *See* Rec., vol. II at 768, 772.

Mr. Joseph correctly points out that the court's June 4 order was not a proper class notice under Rule 23(c)(2). Specifically, the order was not a notice to the class of debenture purchasers to come forward and identify themselves if they were interested in pursuing a claim. Rather, it merely directed existing litigants to file their unresolved claims. It was therefore error for the district court to base its decision not to certify the class on the response to its interlocutory order.

reliance; and his section 11 claims were timely filed because the limitations period was tolled when the Coordinated Amended Complaint was filed on October 4, 1989 in federal district court. Finally, we will not direct the certification of a debenture purchasers' class because the district court has not ruled on the merits of Mr. Joseph's Rule 23 motion.

We **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court for further proceedings consistent with this opinion.