**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-4475

———————


JOHN A. MALACK;
MICHAEL R. ROSATI;
VIRGIL MAGNON;
S. S. RAJARAM, M.D.;
HAYWARD PEDIATRICS, INC.;
HENRY MUNSTER,

Appellants

v.

BDO SEIDMAN, LLP

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court  No. 2-08-cv-00784
District Judge: The Honorable Thomas N. O'Neill, Jr.

———————

Argued June 23, 2010

1

Before: SMITH, FISHER, and GREENBERG, *Circuit Judges*

(Filed: August 16, 2010)

Todd S. Collins (argued)
Elizabeth W. Fox
Neil F. Mara
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103
        *Counsel for Appellants*

Jacob A. Goldberg
Faruqi & Faruqi
101 Greenwood Avenue
Suite 600
Jenkintown, PA 19046
        *Counsel for Appellants*

Kurt B. Olsen
Klaftner, Olsen & Lessner
1250 Connecticut Avenue, N.W.
Suite 200
Washington, DC 20035
        *Counsel for Appellants*

Jill M. Czeschin
Matthew A. Goldberg
Timothy E. Hoeffner (argued)
DLA Piper

1650 Market Street
One Liberty Place, Suite 4900
Philadelphia, PA 19103
    *Counsel for Appellee*

---

## OPINION

---

SMITH, *Circuit Judge.*

    This appeal arises from the denial of class certification in a securities fraud class action. John Malack purchased notes issued by American Business Financial Services, Inc. ("American Business"), a subprime mortgage originator, and those notes were later rendered worthless during the subprime mortgage meltdown. He now seeks compensation from BDO Seidman LLP ("BDO"), an accounting firm that assisted American Business in allegedly defrauding him and other investors by providing American Business clean audit opinions that were used to register the notes with the Securities and Exchange Commission ("SEC"). Malack filed a putative securities fraud class action against BDO based on § 10(b) of the Securities Exchange Act of 1934[1] and Rule 10b-5.[2] The

---

[1] That provision of the Securities Exchange Act of 1934 states:

    It shall be unlawful for any person, directly or

indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[2] Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

4

District Court denied class certification, holding that Malack did not satisfy the predominance requirement of Rule 23(b)(3)[3] because he did not establish a presumption of reliance under the fraud-created-the-market theory.[4] Malack now appeals the denial of class certification.

This case turns on the application *vel non* of the fraud-

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[3] All references to "Rule 23" refer to Rule 23 of the Federal Rules of Civil Procedure.

[4] Malack did not seek certification of a class based on actual reliance.

created-the-market theory of reliance. Without the presumption of reliance afforded by that theory, Malack cannot receive class certification. The theory's validity is an issue of first impression for this Court, and other Courts of Appeals are split over whether it should be recognized. We join the Seventh Circuit in rejecting the theory and will affirm the District Court's denial of class certification.

I.

The District Court had jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331. This appeal reaches us under 28 U.S.C. § 1292(e) and Rule 23(f). A district court's decision on class certification is reviewed for an abuse of discretion. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008). An abuse of discretion occurs "if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation marks omitted). "[W]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *Id.* (internal quotation marks omitted).

II.

Malack and other investors directly purchased notes from American Business between October 3, 2002, and January 20, 2005. The notes promised to pay interest well above the prime rate without the involvement of underwriters or brokers, were

non-transferrable, could only be cashed in after they matured, and had no market for resale. The notes were issued pursuant to American Business's 2002 and 2003 registration statements and prospectuses filed with the SEC. BDO provided the audit opinions necessary to complete the filings with the SEC.

On January 21, 2005, American Business filed a Chapter 11 petition for reorganization. On May 17, 2005, that proceeding was converted to a Chapter 7 liquidation. Malack and the other investors suffered substantial losses as a result. On February 15, 2008, Malack filed a putative securities fraud class action against BDO, alleging that its audits of American Business were deficient. According to Malack, had BDO done its job properly, it would not have issued American Business clean audit opinions. Malack further alleges that without clean audit opinions, American Business would not have been able to register the notes with the SEC, the notes would not have been marketable, and Malack and the other investors would not have purchased the notes. Based on these allegations, Malack asserted that BDO violated § 10(b) of the 1934 Act and Rule 10b-5.

Malack sought class certification. The District Court, after a thorough analysis of the possible approaches through which Malack might have obtained a presumption of reasonable reliance based on the fraud-created-the-market theory, denied his request, concluding that the proposed class did not satisfy

7

the predominance requirement of Rule 23.[5]  Malack timely petitioned for permission to appeal under Rule 23(f).  We granted that petition and now must consider whether the District Court erred in denying Malack class certification.

## III.

Malack challenges the District Court's predominance determination.

---

[5]  The District Court's opinion diligently marched through the relevant facts and law, properly identifying the key, relevant aspects of the class certification procedure as set forth in *In re Hydrogen Peroxide Antitrust Litigation*. *Malack v. BDO Seidman, LLP*, No. 08-0784, 2009 U.S. Dist. LEXIS 67785, at *7-9 (E.D. Pa. Aug. 3, 2009).  In particular, the District Court correctly stated that at class certification Malack must "demonstrate that [each essential] element [of his claim] . . . is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at *11-12 (internal quotation marks omitted).  After a discussion of the elements of a Rule 10b-5 claim, including the element of reasonable reliance, *id.* at *12-15, the District Court turned to whether Malack could establish a presumption of reliance based on the fraud-created-the-market theory, *id.* at *18-42.  It surveyed the various approaches to the theory, applied each approach to Malack's claim, and concluded that under no approach could Malack receive a presumption of reliance. *Id.*

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation [. . . .]" "Issues common to the class must predominate over individual issues . . . ." Because the "nature of the evidence that will suffice to resolve a question determines whether the question is common or individual," "'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case[.]'" "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310-11 (internal citations omitted). "Accordingly, we examine the elements of [Malack's] claim 'through the prism' of Rule 23 to determine whether the District Court properly [denied] certifi[cation] [of] the class." *Id.* at 311.

A § 10(b) private damages action has six elements:

> (1) a material misrepresentation (or omission);

> (2) scienter, i.e., a wrongful state of mind;

> (3) a connection with the purchase

or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)) (emphasis omitted). The District Court denied class certification because Malack was unable to show that the proposed class was entitled to a presumption of reasonable reliance, *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003) (explaining "reasonable reliance"). The reliance element "requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *Id.* Proving reliance for individual class members can quickly become a cumbersome endeavor that overwhelms the "questions of law or fact common" to the proposed class, Fed. R. Civ. P. 23(b)(3), and could preclude class certification, *see id.* It is likely that for this

10

reason, Malack sought to invoke a presumption of reliance.

## A.

The Supreme Court has held that a presumption of reliance exists in two circumstances. The first means for establishing a presumption of reliance was set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). In that decision, the Supreme Court explained that "positive proof of reliance is not a prerequisite to recovery" in cases "involving primarily a failure to disclose" material facts by defendants obligated to disclose such facts. *Id.* at 153. "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in . . . making . . . th[e] [investment] decision." *Id.* at 153-54.

Second, in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized the fraud-on-the-market theory as a means for establishing a presumption of reasonable reliance in an efficient market:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers

11

> do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Id.* at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). "[I]n an efficient market[,] . . . misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 (3d Cir. 2001) (internal quotation marks omitted). Therefore, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Id.*

Some Courts of Appeals have held that a presumption of reliance may be established through a third theory—the fraud-created-the-market theory. *Compare, e.g.*, *Shores v. Sklar*, 647 F.2d 462, 464 (5th Cir. 1981) (en banc) (setting forth the fraud-created-the-market theory), *with Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130-31 (7th Cir. 1993) (rejecting the theory). Malack seeks to rely on this theory to establish a presumption of reliance for the proposed class.

12

B.

The fraud-created-the-market theory posits that "[t]he securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place." *Shores*, 647 F.2d at 471. A presumption of reliance is established where a plaintiff "prove[s] that the defendants conspired to bring to market securities that were not entitled to be marketed." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1121 (5th Cir. 1988) (internal quotation marks omitted), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989); 4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.10[6][C] (6th ed. 2010) (explaining that a fraud-created-the-market claim involves "a fraudulent scheme depicting the existence of a market which in fact would not exist upon full and accurate disclosure").

> If [the plaintiff] proves no more than that the [securities] would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover. . . . Th[e] theory is not that [the plaintiff] bought inferior [securities], but that the [securities] he bought were fraudulently marketed.

*Shores*, 647 F.2d at 470-71. To be unmarketable, the securities must be "so lacking in basic requirements that [they] would

13

never have been approved by the [issuing entity] nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud." *Id.* at 468. To invoke the theory, a plaintiff must allege that (1) "the existence of the security in the marketplace resulted from the successful perpetration of a fraud on the investment community" and (2) that she "purchased in reliance on the market." *Id.* at 464. Critical to the theory's coherency is the assumption that it is reasonable for an investor to rely "on [a] [security's] availability on the market as an indication of [its] apparent genuineness[.]" *Id.* at 470.

"[Un]marketability, as envisioned by the *Shores* court, is an elusive concept." *Ross v. Bank South, N.A.*, 885 F.2d 723, 735 (11th Cir. 1989) (en banc) (Tjoflat, J., concurring). Three rough categories of unmarketability have emerged: legal, economic, and factual. The lines distinguishing one from the other are hazy. Legal unmarketability asks "if, absent fraud, a regulatory agency or the issuing municipality would have been required by law to prevent or forbid the issuance of the security." *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1160 (6th Cir. 1994). Economic unmarketability asks if "no investor would buy [the security] because, assuming full disclosure, [it] is patently worthless." *Id.* This approach focuses on "hypothetical [securities] that could be issued at any combination of price and interest rate." *Ross*, 885 F.2d at 739 (Tjoflat, J., concurring). "[C]ould the [securities], because of

14

the enormous risk of nonpayment, have been brought onto the market at any combination of price and interest rate if the true risk of nonpayment had been known?" *Id.* at 736. Finally, factual unmarketability looks to the actual securities issued, and asks "whether, in the absence of fraud, the [securities] would have been issued given the actual price and interest rate at which they were issued." *Id.* at 735 (emphasis omitted). "Under this [approach], a [security] is unmarketable if, but for the fraudulent scheme, some 'regulatory' entity (whether official or unofficial) would not have allowed the [security] to come onto the market at its actual price and interest rate." *Id.* at 736 (emphasis omitted).[6]

IV.

Malack asks us to embrace the legal unmarketability

---

[6] Although we have yet to consider the fraud-created-the-market theory, the district courts of this Circuit have applied both the economic and factual unmarketability approaches. *Compare, e.g.*, *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1052 (E.D. Pa. 1991) (endorsing economic unmarketability and stating that the theory "only applies where the underlying business is an absolute sham, worthless from the beginning"), *with Wiley v. Hughes Capital Corp.*, 746 F. Supp. 1264, 1293 (D.N.J. 1990) (applying factual unmarketability approach). We confront the fraud-created-the-market theory head-on—rather than assuming, without deciding, that it is valid—to provide future guidance to the district courts.

15

approach to the fraud-created-the-market theory. No matter what approach is taken, however, the theory lacks a basis in any of the accepted grounds for creating a presumption.

"Presumptions typically serve to assist courts in managing circumstances in which direct proof, for one reason or another, is rendered difficult." *Basic Inc.*, 485 U.S. at 245 (citing D. Louisell & C. Mueller, *Federal Evidence* 541-42 (1977)). "[C]onsiderations of fairness, public policy, and probability, as well as judicial economy," often underlie the creation of presumptions. *Basic Inc.*, 485 U.S. at 245; *United States Dep't of Justice v. Landano*, 508 U.S. 165, 174 (1993); Fed. R. Evid. 301 advisory committee's note. Another relevant concern in the creation of a presumption is whether it is "consistent with . . . congressional policy[.]" *Basic Inc.*, 485 U.S. at 245. "Common sense" also plays a role. *Id.* at 246. Courts may also create presumptions "to correct an imbalance resulting from one party's superior access to the proof," Kenneth S. Broun, George E. Dix, Edward J. Imwinkelreid, D.H. Kaye, Robert P. Mosteller & E.F. Roberts, *McCormick on Evidence* § 343 (John W. Strong ed., 5th ed. 1999), where "social and economic policy incline the courts to favor one contention," *id.*, or "to avoid a[] [factual] impasse," *id.* "Generally, however, the most important consideration in the creation of presumptions is probability. Most presumptions have come into existence primarily because judges have believed that proof of fact B renders the inference of the existence of fact A so probable that it is sensible and timesaving

16

to assume the truth of fact A until the adversary disproves it."
*Id.*

The fraud-created-the-market theory rests on the conjecture that a "[security's] availability on the market [i]s an indication of [its] apparent genuineness[.]" *Shores*, 647 F.2d at 470. Malack points to "common sense and probability" as support for this conjecture, but neither of these considerations bolsters the idea that securities on the market, by the mere virtue of their availability for purchase, are free from fraud. Other considerations relevant to the creation of a presumption also counsel for rejection of the fraud-created-the-market theory.

A.

"Common sense," to the extent Malack invokes it as support, calls for rejecting the proposition that a security's availability on the market is an indication of its genuineness and is worthy of an investor's reliance. For a security's availability on the market to be an indication of its genuineness there must be some entity involved in the process of taking the security to market that acts as a bulwark against fraud. Yet the entities most commonly involved in bringing a security to market do not imbue the security with any guarantee against fraud.

The security's promoter and other entities involved in the issuance, such as the underwriter, the auditor, and legal counsel—the very entities often charged with fraud—cannot be

17

reasonably relied upon to prevent fraud. *Ross*, 885 F.2d at 739-41 (Tjoflat, J., concurring).

> All of the parties involved in an issuance have a significant self-interest in marketing the securities at a price greater than their true value. The promoter/corporation and the issuer (if a separate entity) have an obvious interest in marketing the securities regardless of their true fair market value. Likewise, the [legal] counsel and underwriter, who are often retained under a contingency fee contract, are interested in marketing the securities at an inflated price. The underwriter in particular, who, like an insurer, can spread the risk of loss among many stock or bond subscriptions, has a reduced incentive to investigate thoroughly the true value of the securities it underwrites.

*Id.* at 740. If we were to credit the fraud-created-the-market theory based on the entities involved in the issuance "we [would have to] believe that an initial investor may reasonably rely on clearly self-interested (perhaps dishonest) parties to make decisions that are at least burdensome and at most economically irrational." *Id.*[7] Such a belief runs counter to common sense.

---

[7] One could argue that an issuer and related entities "benefit when [they] develop[] a reputation for disclosing accurate information to investors" and therefore they would

The SEC likewise cannot be reasonably relied upon to prevent fraud because it does not conduct "merit regulation." Rather, it seeks to confirm that the issuer adequately disclosed information pertaining to the security:

> The SEC does not review the merits of the registration statement and the offering. [I]n reviewing 1933 Act registration statements, as is the case with SEC review of filings generally, the focus is on the adequacy and clarity of the disclosure. Specifically, the SEC will consider whether the applicable disclosure items are explained in sufficient detail and with sufficient clarity. In addition to the review of the adequacy of the disclosures, the SEC will examine clarity

generally seek to disclose accurate information. Robert A. Prentice, *The Inevitability of a Strong SEC*, 91 Cornell L. Rev. 775, 781 (2006). Yet recent economic history undermines this argument. *Id.* Many entities now forgo the long term benefits of accurate disclosures for the prospect of short term gain. *Id.* at 782. Indeed, a significant amount of academic literature is devoted to examining the factors influencing issuers and related entities to, on the whole, act less honestly than we once believed they did. *See, e.g.*, Ronald J. Gilson & Reiner Kraakman, *The Mechanisms of Market Efficiency Twenty Years Later: The Hindsight Bias*, 28 Iowa J. Corp. L. 715 (2003); John C. Coffee, Jr., *What Caused Enron? A Capsule Social and Economic History of the 1990s*, 89 Cornell L. Rev. 269 (2004).

19

and also will conduct a "plain English" review of those portions of the registration statement that are subject to the SEC's plain English disclosure requirements.

1 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 3.7[2]. "The SEC does not read all of the publicly available information about an offering and then determine the legitimate price for the security . . . [n]or does [it] endorse any of the documents involved in the issuance of securities." *Joseph v. Wiles*, 223 F.3d 1155, 1165-66 (10th Cir. 2000) (internal citation omitted).[8]

Disclosure of adverse information may lower the price of a security, but it will not prevent that security from going to market:

The existence of a security does not depend on, or warrant, the adequacy of disclosure. Many a

---

[8] For example, the federal regulation pertaining to the "[f]orepart of [a] [r]egistration [s]tatement and [the] [o]utside [f]ront [c]over [p]age of [a] [p]rospectus" states that if a commission legend is needed it must "indicate[] that neither the [SEC] nor any state securities commission has approved or disapproved of the securities or passed upon the accuracy or adequacy of the disclosures in the prospectus and that any contrary representation is a criminal offense." 17 C.F.R. § 229.501(b)(7).

security is on the market even though the issuer or some third party made incomplete disclosures. Federal securities law does not include "merit regulation." Full disclosure of adverse information may lower the price, but it does not exclude the security from the market. Securities of bankrupt corporations trade freely; some markets specialize in penny stocks. Thus the linchpin of *Shores*—that disclosing bad information keeps securities off the market, entitling investors to rely on the presence of the securities just as they would rely on statements in a prospectus—is simply false.

*Eckstein*, 8 F.3d at 1130-31 (internal citations omitted); Note, *The Fraud-on-the-Market Theory*, 95 Harv. L. Rev. 1143, 1158 (1982) ("[A]ny argument about an expectation fostered by SEC regulation is severely undermined by the fact that the SEC does not vouch for either the substantive value of any issue or the veracity of the representations by any issuer."). In short, the "fil[ing] [of] a misleading document with [the SEC] does not lend any more credibility or veracity to the document than if [it] had simply [been] given . . . to investors." *Joseph*, 223 F.3d at 1166.

Malack all but outright concedes that there is no common sense justification for the proposition that a security's presence on the market is an indication of its genuineness upon which an investor may reasonably rely. In his brief, he conceded that the

21

SEC does not conduct merit regulation. At oral argument, he agreed that even if BDO had not committed the alleged fraud, the notes still would have passed SEC review and would have made it to market:

> THE COURT: What if [BDO] had said in all candor, well, the company here, [American Business], is using a discount rate that may be lower than what the market among similar [interest-only strips] that are being . . . sold across this country would indicate. And in fact, they may be understating their default rate in comparison to similarly situated issues. But having said that, these are the facts which a buyer should be aware of. And this is, indeed, a risky investment which pays a high interest rate.

> \* \* \*

> THE COURT: The SEC would've said accepted, go ahead and sell.

| [MALACK'S COUNSEL]: | Certainly, if that disclosure had been provided in the prospectus in the registration statement[.] |
|---|---|

Oral Argument Tr. 9:7-9:24, June 23, 2010.  If the American Business notes would have gone to market with or without BDO's allegedly fraudulent audit, then there is no common sense connection between BDO's audit and Malack's ability to purchase the notes.  Thus, there is no reason to view the notes' presence on the market as being indicative of their genuineness.

## B.

Malack's vague invocation of probability also fails to lend any support to the assertion that a security's availability on the market is an indication of its genuineness.  Unlike the fraud-on-the-market theory, which was supported by empirical studies and economic theory, *see Basic Inc.*, 485 U.S. at 246-47, the fraud-created-the-market theory has the support of neither.[9]

---

[9] Stripped of its fortuitously similar name—which may have bolstered its credibility with some courts—the fraud-created-the-market theory gains no support from the universally accepted fraud-on-the-market theory.  The latter is ultimately grounded in the efficient market hypothesis, which, while imperfect, has a basis in economics.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).  The same cannot be said for the former.  The fraud-created-the-

Moreover, Malack does not articulate any reason why probability supports his view. If his reliance on probability is based on the idea that almost all marketed securities are, in fact, legally marketable, and therefore we should presume that anything offered on the market has not been stained by fraud, then Malack is advocating for a kind of investor insurance that eliminates the need for proving reliance in *any* securities fraud case. *Any* investor who purchases *any* security could point to the security's availability on the market to satisfy the reasonable reliance element of a § 10(b) claim. Such insurance "expand[s]

market theory has no underlying economic justification and any attempt to ride the coattails of the fraud-on-the-market theory is easily rejected. The fraud-created-the-market theory, according to its proponents, may be invoked for any security—even when the market is inefficient, such as in the case of newly issued securities—because its chief prerequisite is that the security have simply made it to market. *See Ross*, 885 F.2d at 739 (Tjoflat, J., concurring); Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059, 1060 n.5 (describing the *Shores* decision as "[p]erhaps the most striking example of the misapplication of [the efficient market hypothesis]"). In its most expansive incarnation, the fraud-created-the-market theory would render superfluous the fraud-on-the market theory advanced in *Basic Inc.* and the presumption of reliance set forth in *Affiliated Ute* because it could be invoked in any instance where a security has made it to market.

the SEC's role beyond its intended or realistic scope." *Joseph*, 223 F.3d at 1165.

The establishment of investor insurance is contrary to the goals of securities laws. *See Basic Inc.*, 485 U.S. at 252 (White, J., concurring in part and dissenting in part); *Fener v. Operating Eng'rs Const. Indus. & Miscellaneous Pension Fund (Local 66)*, 579 F.3d 401, 411 (5th Cir. 2009); *Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir. 1997); *Ockerman*, 27 F.3d at 1162; *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1376 (9th Cir. 1985); *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir. 1965). "[T]he securities laws enacted by Congress in the 1930s were not intended to create a scheme of investors' insurance or to regulate directly the underlying merits of various investments. Compared to the consumer-oriented legislation of the late 1960s and 1970s, the federal securities laws leave a great many potential 'harms' (in the sense of economic losses by individual investors) unremedied." *Shores*, 647 F.2d at 482 (Randall, J., dissenting).

Because Malack has not articulated any justification for his argument that probability supports the fraud-created-the-market theory, and because the most obvious possible justification is flawed, we are comfortable stating that the theory is not supported by probability and decline to further speculate on the issue.

C.

25

Other considerations relevant to whether a presumption should be created similarly point toward rejecting the fraud-created-the-market theory.  First, the theory does not serve the securities laws' goal of informing investors via disclosures.  "In *Affiliated Ute*, the Supreme Court described the 1934 Act and its companion legislative enactments (including the Securities Act of 1933) as embracing a 'fundamental purpose to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'"  *Id.* (quoting *Affiliated Ute*, 406 U.S. at 151); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977) (noting that the Supreme Court has "repeatedly . . . described the 'fundamental purpose' of the [Securities Exchange] Act as implementing a 'philosophy of full disclosure'"); *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571 (1995) ("The primary innovation of the 1933 Act was the creation of federal duties -- for the most part, registration and disclosure obligations -- in connection with public offerings.").

"[T]he federal securities laws are intended to put investors into a position from which they can help themselves by relying upon disclosures that others are obligated to make." *Shores*, 647 F.2d at 483 (Randall, J., dissenting).  The fraud-created-the-market theory, contrary to this goal, allows "monetary recovery [for] those who refuse to look out for themselves."  *Id.*  Investors need not examine a disclosure because, no matter what, the security's presence on the market

26

would be enough to satisfy the reasonable reliance element of a § 10(b) claim. *See id.* Indeed, an investor stands to lose nothing by blindly purchasing securities without examining any disclosure because the damages award for a fraud-created-the-market claim would be the same as the measure of damages for a Rule 10b-5 claim based on actual reliance:

> [T]he only workable measure of damages in a *Shores* action would be the full price paid by the plaintiff for the new issue. That being so, a *Shores* award would simply be the plaintiff's out-of-pocket expenses caused by the fraud -- the same measure of damages for a standard Rule 10b-5 recovery based upon actual reliance, *see* L. Loss, Fundamentals of Securities Regulation 967 (2d ed. 1988) (out-of-pocket normally means difference between price paid and value of securities). Thus, under *Shores*, any incentive to read disclosures essentially disappears since plaintiffs would receive the full purchase price for their securities without having to read disclosure information.

*Ross*, 885 F.2d at 743 (Tjoflat, J., concurring). Moreover, "an investor might rationally seek to avoid reading disclosures in order to preserve a possible claim under *Shores*." *Id.* at 744. The less an investor knows about the security, aside from the fact that it is on the market, the less likely it is that she will learn of information that would sever the link between the alleged

27

fraud and her decision to purchase the security.  *Cf. Basic Inc.*, 485 U.S. at 248 (explaining how fraud-on-the-market presumption may be rebutted).  Discouraging investors from examining disclosures accompanying securities runs contrary to Congress's goal of empowering investors with the information they need to make educated, prudent investment decisions.

Malack argues that the fraud-created-the-market theory would serve Congress's goals of promoting honesty and fair dealings in the securities markets.  *Shores*, 647 F.2d at 470; *see* 7 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 22:1 (4th ed. 2002) ("[T]he federal securities laws were designed to deter future wrongdoing in the securities field and promote the integrity of the securities market, and the class action has been recognized as an effective means to realize these goals.").  Promoting honesty and fair dealings is certainly an important concern, but it is also an exceedingly abstract concern.  If we were guided mainly by the promotion of free and honest securities markets, then we would seek to expand § 10(b) liability whenever possible to prevent fraud.  But that has not been the approach taken by the federal courts.  The securities laws are not a catchall for any fraudulent activity committed in connection with a securities offering.  For example, the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Id.* at 191.  It did so over a dissent that cited the Exchange Act's goal of "creati[ng] and

28

maint[aining] . . . a post-issuance securities market that is free from fraudulent practices." *Id.* at 193 (Stevens, J., dissenting) (internal quotation marks omitted).

More recently, in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), the Supreme Court cast further doubt on the legitimacy of expansively presuming reliance to promote honesty and fair dealings. In *Stoneridge*, the Supreme Court noted that, at least since *Central Bank*, Congress has approved of narrowing the scope of § 10(b) liability. As already explained, in *Central Bank*, the Supreme Court held that "§ 10(b) liability did not extend to aiders and abettors." *Stoneridge*, 552 U.S. at 157. "Th[at] decision . . . led to calls for Congress to create an express cause of action for aiding and abetting within the Securities Exchange Act." *Id.* at 158. But Congress declined to do so. *Id.* "Instead, in § 104 of the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 757, [Congress] directed [that] prosecution of aiders and abettors [be carried out] by the SEC." *Id.* (citing 15 U.S.C. § 78t(e)). The PSLRA also instituted heightened pleading and loss causation requirements for "any private action" arising from the Securities Exchange Act. *Stoneridge*, 552 U.S. at 165-66. Therefore, Congress's actions after *Central Bank* were in accord with the Supreme Court's view that § 10(b) liability should remain narrow and limited to its current contours. *See id*. at 165 ("Congress . . . ratified the implied right of action after the [Supreme] Court moved away from a broad willingness to imply private rights of action."); *cf. Merrill*

*Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80-82 (2006) (explaining that Congress passed the Securities Litigation Uniform Standards Act of 1998 to stem the shift of securities litigation from federal to state courts sparked by the PSLRA); 15 U.S.C. § 78bb(f)(1).

In addition, the *Stoneridge* Court explained that "[c]oncerns with the judicial creation of a private cause of action caution against" the expansion of the § 10(b) cause of action. *Stoneridge*, 552 U.S. at 165. Extending the cause of action "is for Congress, not for [the courts]." *Id.* The Supreme Court, after describing the two accepted presumptions of reliance set forth in *Affiliated Ute* and *Basic Inc.*, *id.* at 159, stated unequivocally that "the § 10(b) private right should not be extended beyond its present boundaries," *id.* at 165. Although the *Stoneridge* Court was not specifically considering the fraud-created-the-market theory, we view its instruction as general support for rejecting such new presumptions of reliance. *See id.* at 159; *cf. Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 942 (9th Cir. 2009) (per curiam). Adoption of the fraud-created-the-market theory would extend § 10(b) liability far beyond its current contours.

Policy concerns also support rejection of the fraud-created-the-market theory. Congress has made it clear that it is hostile to frivolous § 10(b) litigation. *E.g.*, 15 U.S.C. § 78u-4(b)(2) (requiring particularity in securities fraud complaint where "plaintiff may recover money damages only on proof that

30

the defendant acted with a particular state of mind"); *id.* § 78u-4(c) (providing sanctions for abusive litigation). Yet the fraud-created-the-market theory encourages exactly such litigation by essentially eliminating the reliance requirement for a § 10(b) claim. This has at least two negative impacts.

First, Rule 10b-5 litigation, by its very nature, is costly. An increase in frivolous litigation drives up the overall costs of issuing securities, ultimately harming everyone involved. In *Central Bank*, the Supreme Court noted that Rule 10b-5 litigation presents a "danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Central Bank*, 511 U.S. at 189 (internal quotation marks omitted). As support, the Court pointed to Senator Sanford's statement that "in 83% of 10b-5 cases major accounting firms pay $ 8 in legal fees for every $ 1 paid in claims." *Id.* (citing 138 Cong. Rec. S12605 (Aug. 12, 1992) (remarks of Sen. Sanford)). Secondary actors, like accounting firms, must "expend large sums even for pretrial defense and the negotiation of settlements." *Central Bank*, 511 U.S. at 189. These costs infect the function of the entire securities market, harming professionals (lawyers, accountants, etc.), the companies they serve, and investors:

> [N]ewer and smaller companies may find it difficult to obtain advice from professionals. A professional may fear that a newer or smaller company may not survive and that business

31

failure would generate securities litigation against the professional, among others. In addition, the increased costs incurred by professionals because of the litigation and settlement costs under 10b-5 may be passed on to their client companies, and in turn incurred by the company's investors, the intended beneficiaries of the statute.

*Id.*

Second, the presumption of reliance is a powerful tool for plaintiffs seeking class certification and class certification puts pressure on defendants to settle claims, even if they are frivolous. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310 (noting that "class certification may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability") (internal quotation marks omitted); *Dabit*, 547 U.S. at 80 ("Even weak cases brought under . . . Rule [10b-5] may have substantial settlement value . . . because [t]he very pendency of the lawsuit may frustrate or delay normal business activity.") (internal quotation marks omitted); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (explaining that class certification is an "especially serious decision"); *Newton*, 259 F.3d at 162 (recognizing "that denying or granting class certification is often the defining moment in class actions . . . [because] it may . . . create unwarranted pressure to settle nonmeritorious claims on the part of defendants"). A frivolous

class action becomes much more troublesome when it is aided by a presumption of reliance and defendants may seek to settle early and often to avoid litigation costs and the risk of getting hit with a large verdict at trial. Rewarding frivolous actions with settlements is clearly undesirable.

## V.

Assuming, hypothetically, that we were to endorse the fraud-created-the-market theory, and that we followed Malack's approach to the theory, his appeal would still fail.[10] Malack urges us to follow the legal unmarketability test offered in *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330 (10th Cir. 1983). But even if we did so, he would not be able to successfully invoke a presumption of reasonable reliance. In *T.J. Raney & Sons*, the Tenth Circuit held that "[f]ederal and state regulation of new securities at a minimum should permit a purchaser to assume that the securities were lawfully issued." *Id.* at 1333. Importantly, it added that its holding "does not imply in any way that the regulatory body considers the worth of the security or the veracity of the representations made in the offering circular nor does it establish a scheme of investors' insurance." *Id.* (internal quotation marks omitted). Instead, it extended the protection of

---

[10] To be clear, our holding rejecting the fraud-created-the-market theory in its entirety is in no way weakened by the following discussion.

33

Rule 10b-5 to "cases in which the securities were not legally qualified to be issued" and there was "a scheme to defraud or act to defraud." *Id.* Applying its legal unmarketability test to the facts of the case, the Tenth Circuit observed that the entity accused of fraud was found not to be a valid public trust during Chapter IX proceedings and therefore its issuance of bonds was prohibited by state law. *Id.* Based on this observation, the Tenth Circuit held that the plaintiff "reasonably relied on the availability of the bonds [for sale] as indicating their lawful issuance[.]" *Id.*

The instant case does not meet the *T.J. Raney & Sons* test for legal unmarketability. Critical to that Court's reasoning was the observation that the relevant bonds were issued in violation of state law because the issuer was not a valid public trust. *See id.* Because the issuer never had the legal right to issue the bonds and the bonds were marketed with the intent to defraud, the bonds were legally unmarketable. *See id.* There was no similar legal impediment to American Business issuing notes. Malack conceded at oral argument that had BDO properly conducted the audit and disclosed the deficiencies he argues were present in the allegedly fraudulent audit, the SEC *still* would have permitted the notes to go to market. According to the Tenth Circuit, "[t]here is a significant difference between securities which *should* not be marketed because they involve fraud, and securities which *cannot* be marketed because the issuers lack legal authority to offer them." *Joseph*, 223 F.3d at 1165 (emphasis added). Malack's own arguments in this appeal

34

place American Business's notes squarely into the former category, and such securities do not satisfy the Tenth Circuit's fraud-created-the-market test, *id.*

VI.

The fraud-created-the-market theory lacks a basis in common sense, probability, or any of the other reasons commonly provided for the creation of a presumption. As such, we decline to recognize a presumption of reliance based on the theory and will affirm the District Court's denial of class certification.

35