**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| FIYYAZ PIRANI, *Plaintiff-Appellee*, v. SLACK TECHNOLOGIES, INC.; STEWART BUTTERFIELD; ALLEN SHIM; BRANDON ZELL; ANDREW BRACCIA; EDITH COOPER; SARAH FRIAR; JOHN O'FARRELL; CHAMATH PALIHAPITIYA; GRAHAM SMITH; SOCIAL+CAPITAL PARTNERSHIP GP II L.P.; SOCIAL+CAPITAL PARTNERSHIP GP II LTD.; SOCIAL+CAPITAL PARTNERSHIP GP III L.P.; SOCIAL+CAPITAL PARTNERSHIP GP III LTD.; SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP L.P.; SOCIAL+CAPITAL PARTNERSHIP OPPORTUNITIES FUND GP LTD.; ACCEL GROWTH FUND IV ASSOCIATES L.L.C.; ACCEL GROWTH FUND INVESTORS 2016 L.L.C.; ACCEL LEADERS FUND ASSOCIATES L.L.C.; ACCEL LEADERS FUND INVESTORS 2016 L.L.C.; ACCEL X ASSOCIATES L.L.C.; ACCEL INVESTORS 2009 L.L.C.; ACCEL XI ASSOCIATES L.L.C.; ACCEL | No. 20-16419 D.C. No. 3:19-cv-05857-SI OPINION |

INVESTORS 2013 L.L.C.; ACCEL
GROWTH FUND III ASSOCIATES
L.L.C.; AH EQUITY PARTNERS I
L.L.C.; A16Z SEED-III LLC,
        *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted May 13, 2021
San Francisco, California

Filed September 20, 2021

Before: Sidney R. Thomas, Chief Judge, Eric D. Miller,
Circuit Judge, and Jane A. Restani,[*] Judge.

Opinion by Judge Restani;
Dissent by Judge Miller

---

[*] The Honorable Jane A. Restani, Judge for the United States Court
of International Trade, sitting by designation.

## SUMMARY[**]

### Securities Law

The panel affirmed the district court's order denying in part a motion to dismiss and ruling that Fiyyaz Pirani had standing to sue Slack Technologies, Inc., and individual defendants under §§ 11 and 12(a)(2) of the Securities Act of 1933 based on shares issued under a new rule from the New York Stock Exchange allowing companies to make shares available to the public through a direct listing.

Pirani alleged that Slack's registration statement was inaccurate and misleading under §§ 11 and 12(a)(2). Sections 11 and 12 refer to "such security," meaning a security issued under a specific registration statement. The panel held that, even though Pirani could not determine if he had purchased registered or unregistered shares in a direct listing, he had standing to bring a claim under §§ 11 and 12 because his shares could not be purchased without the issuance of Slack's registration statement, thus demarking these shares, whether registered or unregistered, as "such security" under §§ 11 and 12.

The panel held that because standing existed for Pirani's § 11 claim against Slack, standing also existed for a dependent § 15 claim against controlling persons. The panel concluded that statutory standing existed under §§ 11 and 15, and under § 12(a)(1) to the extent it paralleled § 11.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Miller wrote that he would reverse the district court's order and remand with instructions to grant the motion to dismiss in full because Pirani could not prove that his shares were issued under the registration statement that he said was inaccurate, and he therefore lacked statutory standing.

## COUNSEL

Michael D. Celio (argued), Gibson Dunn & Crutcher LLP, Palo Alto, California; Theodore J. Boutrous Jr. and Daniel R. Adler, Gibson Dunn & Crutcher LLP, Los Angeles, California; Matthew S. Kahn, Michael J. Kahn, and Avery E. Masters, Gibson Dunn & Crutcher LLP, San Francisco, California; Jason H. Hilborn, Gibson Dunn & Crutcher LLP, Washington, D.C.; for Defendants-Appellants.

Lawrence P. Eagel (argued), W. Scott Holleman, and David J. Stone, Bragar Eagel & Squire P.C., New York, New York; Melissa A. Fortunato and Marion C. Passmore, Bragar Eagel & Squire P.C., San Francisco, California; for Plaintiff-Appellee.

Jennifer J. Schulp, Ilya Shapiro, and Sam Spiegelman, Cato Institute, Washington, D.C., for Amicus Curiae The Cato Institute.

Gavin M. Masuda and Morgan E. Whitworth, Latham & Watkins LLP, San Francisco, California; Andrew B. Clubok, Latham & Watkins LLP, Washington, D.C.; Gregory Mortenson, Latham & Watkins LLP, New York, New York; Ira D. Hammerman and Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, D.C.; Jeffrey E. Farrah, National Venture Capital

Association, Washington, D.C.; Daryl Joseffer and Tara S. Morrissey, U.S. Chamber Litigation Center, Washington, D.C.; for Amici Curiae Securities Industry and Financial Markets Association, Chamber of Commerce of the United States of America, and National Venture Capital Association.

**OPINION**

RESTANI, Judge:

This case involves an interlocutory appeal from a dispute between Plaintiff-Appellee Fiyyaz Pirani (Pirani) and Defendants-Appellants Slack Technologies, Inc. (Slack) regarding whether Pirani had standing to sue under Section 11 and Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2), based on shares issued under a new rule from the New York Stock Exchange (NYSE) that allows companies to make shares available to the public through a direct listing. *See* Order Granting Accelerated Approval of NYSE Proposed Rule Change Relating to Listing of Companies, Exchange Act Release No. 34-82627, 83 Fed. Reg. 5650, 5653–54 (Feb. 2, 2018) ("SEC Approval 2018"). Slack challenges the district court's ruling that Pirani had standing to sue under Section 11 and Section 12(a)(2) even though Pirani could not determine if he had purchased registered or unregistered shares in the direct listing. We conclude that Pirani had standing to bring a claim under Section 11 and Section 12(a)(2) because Pirani's shares could not be purchased without the issuance of Slack's registration statement, thus demarking these shares, whether registered or unregistered, as "such security" under Sections 11 and 12 of the Securities Act. We do not resolve the issue of whether Pirani has

sufficiently alleged the other elements of Section 12 liability. The decision of the district court is affirmed.

## BACKGROUND

Typically, large companies who want to list their stock on a public exchange for the first time do so in a firm commitment underwritten initial public offering (IPO). In an IPO listing, a company issues new shares under a registration statement that registers those shares with the Securities and Exchange Commission (SEC). 15 U.S.C. § 77e(c). An investment bank then helps the company market these shares and, if necessary, commits to purchasing the new shares at a pre-determined price. Because the bank wants to ensure that the stock price remains stable, it typically insists on a lock-up period, a months-long period during which existing shareholders may not sell their unregistered shares. *See* 24 William M. Prifti et al., *Securities: Public and Private Offerings* § 4:7 (2d ed. 2021). If someone purchases a share of the company's stock during the lock-up period, the shares are necessarily registered because no unregistered shares can be sold during that period. This period, however, is not required by law. In addition, companies can make subsequent offerings of registered shares tied to new or updated registration statements. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) (involving a company issuing a prospectus supplement in connection with a secondary offering of the company's stock).

In 2018, the NYSE introduced a rule, later approved by the SEC, that allows companies to go public (i.e. sell their shares on a national exchange) through a Selling Shareholder Direct Floor Listing (direct listing). *See* SEC Approval 2018, 83 Fed. Reg. at 5653–54; *NYSE Listed Company Manual – Section 102.01B Footnote E*, NEW YORK STOCK

EXCHANGE (Aug. 26, 2020), https://nyseguide.srorules.com/listed-company-manual ("*NYSE, Section 102.01B, Footnote E*").  Unlike in an IPO, in a direct listing the company does not issue any new shares and instead files a registration statement "solely for the purpose of allowing existing shareholders to sell their shares" on the exchange.[1]  SEC Approval 2018, 83 Fed. Reg. at 5651; *NYSE, Section 102.01B, Footnote E*.  The company must register its pre-existing shares before they can be sold to the public unless the shares fall within one of the registration exceptions enumerated in SEC Rule 144.   17 C.F.R. § 230.144.  Another important distinction between an IPO and a direct listing is that a direct listing allows a company to list "without a related underwritten offering" from a bank.  *NYSE, Section 102.01B, Footnote E*.  Shares made available by a direct listing are sold directly to the public and not through a bank.  *See id.*   Therefore, there is no lock-up agreement restricting the sale of unregistered shares.  Thus, from the first day of a direct listing, both unregistered and registered shares may be available to the public.

On June 20, 2019, Slack went public through a direct listing, releasing 118 million registered shares and 165 million unregistered shares into the public market for purchase.  Pirani purchased 30,000 Slack shares that day and went on to purchase another 220,000 shares over several months.  The initial offering price for Slack shares was

---

[1] In 2020, the NYSE amended its rule to create a second type of direct listing, a Primary Direct Floor Listing, which allowed a company itself to sell shares to the public instead of or in addition to existing shareholders selling their shares.  *See NYSE, Section 102.01B, Footnote E*; *see also* Order Approving a Proposed Rule Change To Modify the Provisions Relating to Direct Listings, Exchange Act Release No. 34-90768, 85 Fed. Reg. 85,807, 85,808 n.15 (Dec. 22, 2020).

$38.50. Over the next few months, Slack experienced multiple service disruptions that caused the share price to drop below $25. On September 19, 2019, Pirani brought a class action lawsuit against Slack, as well as its officers, directors, and venture capital fund investors, on behalf of himself and all other persons and entities who acquired Slack stock pursuant and/or traceable to the Company's registration statement and prospectus issued in the direct listing.

Pirani brought claims against Slack for violations of Section 11, Section 12(a)(2), and Section 15(a) of the Securities Act of 1933. Pirani alleges that Slack's registration statement was inaccurate and misleading because it did not alert prospective shareholders to the generous terms of Slack's service agreements, which obligated Slack to pay out a significant amount of service credits to customers whenever the service was disrupted, even if the customers did not experience the disruption. Nor did it disclose, according to Pirani, that these service disruptions were frequent in part because Slack guaranteed 99.99% uptime.[2] Finally, Pirani alleges that the statement downplayed the competition Slack was facing from Microsoft Teams at the time of its direct listing. Slack challenges whether Pirani has statutory standing to sue under Section 11 and Section 12(a)(2) because he cannot prove that his shares were registered under the allegedly misleading registration statement.

---

[2] Uptime refers to the time when a computer service is available to users without disruptions. Slack guarantees that 99.99% of the time, users will experience no service disruptions.

## PROCEDURAL HISTORY

On January 21, 2020, Slack moved to dismiss the class action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  On April 21, 2020, the district court granted the motion in part and denied the motion in part.

The district court held that Pirani had standing under Section 11 because he could show that the securities he purchased, even if unregistered, were "of the same nature" as those issued pursuant to the registration statement.  The district court adopted a broad reading of "such security" within Section 11 to account for the difficulty of distinguishing between registered and unregistered shares when both are sold simultaneously in a direct listing.  The district court concluded that Pirani had standing to sue under Section 11 even though he did not know whether the shares he purchased were registered or unregistered.

The district court also held that Pirani had standing under Section 12(a)(2) to sue the individual defendants.[3]  As with Section 11, the district court read Section 12(a)(2)'s requirement that the plaintiff purchase "such security" from a defendant who "offers or sells a security . . . by means of a prospectus," 15 U.S.C. § 77l(a)(2), to include registered or unregistered securities offered in the direct listing.  The district court also held that Pirani had pled sufficient facts to support that the individual defendants had solicited Pirani's purchase of Slack shares by preparing and signing the

---

[3] The individual defendants are: Stewart Butterfield (Chief Executive Officer of Slack), Allen Shim (Chief Financial Officer of Slack), Brandon Zell (Chief Accounting Officer of Slack), and Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, and Graham Smith (Directors of Slack's Board).

offering materials while they were financially motivated to encourage sales of Slack shares.  The district court dismissed the Section 12(a)(2) claim against Slack because Slack had not issued any new shares in the offering.

Finally, because Pirani had stated a claim against Slack under Section 11, the district court ruled that he had standing under Section 15 to sue the individual and venture capital defendants[4] for secondary liability.

On June 5, 2020, at the Defendants' request, the district court certified its April 21, 2020, order (regarding the motion to dismiss), for interlocutory appeal "because the question of whether shareholders can establish standing under Sections 11 and 12(a)(2) in connection with a direct listing is one of first impression on which fair-minded jurists might disagree."  On July 23, 2020, we granted Slack's petition for permission to appeal pursuant to 28 U.S.C. § 1292(b).

## JURISDICTION & STANDARD OF REVIEW

We granted Slack's petition for interlocutory appeal on July 23, 2020, and thereby have jurisdiction under 28 U.S.C. § 1292(b) over the entire order.  *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (holding "the appellate court may address any issue fairly included within the certified order").

We review a district court's decision to grant or deny a motion to dismiss under Rule 12(b)(6) *de novo*.  *See Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir.

---

[4] The venture capital defendants are three venture capital firms and the board members that they appointed to Slack's Board of Directors: Accel and Andrew Braccia, Andreessen Horowitz and John O'Farrell, and Social+Capital and Chamath Palihapitiya.

2011); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1079 (9th Cir. 1999). In deciding a motion to dismiss, "[t]he facts alleged in a complaint are to be taken as true and must 'plausibly give rise to an entitlement to relief.'" *Dougherty*, 654 F.3d at 897 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A complaint must "state a claim to relief that is plausible on its face[.]" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## DISCUSSION

### I. Section 11 Standing

Section 11 of the Securities Act of 1933 states:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not mis-leading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue—(1) every person who signed the registration statement . . . .

15 U.S.C. § 77k(a) (emphasis added). The meaning that has been applied in this circuit is that "such security" in Section 11 means a security issued under a specific registration statement, not some later or earlier statement. *See Hertzberg*, 191 F.3d at 1080 (holding that "such security" under Section 11 "means that the person must have

purchased a security issued under that, rather than some other, registration statement"); *Century Aluminum*, 729 F.3d at 1106 (holding that "[p]laintiffs need not have purchased shares in the offering made under the misleading registration statement . . . [purchasers in the aftermarket] have standing to sue provided they can trace their shares back to the relevant offering"). Past cases in this and other circuits have dealt with successive registrations, whereby a company issues a secondary offering to the public such that there are multiple registration statements under which a share may be registered, and other tracing challenges stemming from an IPO. *See e.g., Century Aluminum*, 729 F.3d at 1106; *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 972 (8th Cir. 2002); *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 491, 496–97 (5th Cir. 2005). In those cases, the court has interpreted "any person acquiring such security" in Section 11 to mean "that the person must have purchased a security issued under that, rather than some other, registration statement." *Hertzberg*, 191 F.3d at 1080. When "all the stock ever publicly issued by [a company] was sold in the single offering at issue . . . . [t]he difficulties of tracing stock to a particular offering present in some cases are [] not present." *Id.* at 1082.

The district court is correct that this is a case of first impression. The issue before the court today is: what does "such security" mean under Section 11 in the context of a direct listing, where only one registration statement exists, and where registered and unregistered securities are offered to the public at the same time, based on the existence of that one registration statement? The words of a statute do not morph because of the facts to which they are applied. *See Clark v. Martinez*, 543 U.S. 371, 382 (2005). Thus, we do not adopt, as the district court did, the broad meaning of Section 11 that Judge Friendly rejected in *Barnes v. Osofsky*, 373 F.2d 269, 271, 273 (2d Cir. 1967). Instead, to answer

this question we look directly to the text of Section 11 and the words "such security."

Slack was listed for the first time on the NYSE via a direct listing. The SEC declared Slack's registration effective on June 7, 2019, and Slack began selling shares on June 20, 2019. Per the NYSE rule, a company must file a registration statement in order to engage in a direct listing. *See NYSE, Section 102.01B, Footnote E* (allowing a company to "list their common equity securities on the Exchange *at the time of effectiveness of a registration statement* filed solely for the purpose of allowing existing shareholders to sell their shares") (emphasis added); *see also* SEC Approval 2018, 83 Fed. Reg. at 5651. The SEC interprets this reference to a registration statement in the rule as an effective registration statement filed pursuant to the Securities Act of 1933. *See* Order Approving a Proposed Rule Change To Modify the Provisions Relating to Direct Listings, Exchange Act Release No. 34-90768, 85 Fed. Reg. 85,807, 85,808 n.15 (Dec. 22, 2020) ("SEC Approval 2020"). As indicated, in contrast to an IPO, in a direct listing there is no bank-imposed lock-up period during which unregistered shares are kept out of the market. Instead, at the time of the effectiveness of the registration statement, both registered and unregistered shares are immediately sold to the public on the exchange. *See NYSE, Section 102.01B, Footnote E*. Thus, in a direct listing, the same registration statement makes it possible to sell both registered and unregistered shares to the public.

Slack's unregistered shares sold in a direct listing are "such securities" within the meaning of Section 11 because their public sale cannot occur without the only operative registration in existence. Any person who acquired Slack

shares through its direct listing could do so only because of the effectiveness of its registration statement.

Because this case involves only one registration statement, it does not present the traceability problem identified by this court in cases with successive registrations. *See Hertzberg*, 191 F.3d at 1082; *Century Aluminum*, 729 F.3d at 1106 ("When all of a company's shares have been issued in a single offering under the same registration statement, this 'tracing' requirement generally poses no obstacle.").[5]  All of Slack's shares sold in this direct listing, whether labeled as registered or unregistered, can be traced to that one registration.

The legislative history of Section 11 supports this interpretation.  The Securities Act of 1933 was motivated in part by the stock market crash of 1929, with a goal of "throw[ing] upon originators of securities a duty of

---

[5] Counsel for Slack raised for the first time in oral argument that Slack issued two registration statements in its direct listing, a Form S-1 (the traditional registration statement) and a Form S-8 (registering sales of shares to employees through their compensation packages).  Both forms went into effect on the same day.  The record before this court does not include the Form S-8.  Rather, counsel pointed the court to the page in the S-1 that references the S-8.  In any case, the court takes judicial notice of Slack's Form S-8, filed June 7, 2019, and available at https://sec.report/Document/0001628280-19-007750/.  *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject to judicial notice).  In addition, the S-8 explicitly incorporates the S-1 by reference, meaning that any allegedly misleading statements in the S-1 are necessarily present in the S-8, and that these two forms are part of the same registration package.  Finally, to the extent that Slack is arguing that Pirani's shares could have been registered under a different registration statement (presenting the same exact traceability conundrum as in past cases), this factual scenario is not present here and is speculative.

competence as well as innocence which the history of recent spectacular failures overwhelmingly justifies." H.R. Rep. No. 73-85, at 9 (1933) (Conf. Rep.). The House Conference Report explained that "[f]undamentally, [Sections 11 and 12] entitle the buyer of securities sold *upon a registration statement* including an untrue statement or omission of material fact, to sue for recovery. . . " *Id.* (emphasis added). The drafters noted "it is the essence of fairness to insist upon the assumption of responsibility for the making of these statements" when the "connection between the statements made and the purchase of the security is clear[.]" *Id.* at 10. Here, both the registered and unregistered Slack shares sold in the direct listing were sold "upon a registration statement" because they could only be sold to the public at the time of the effectiveness of the statement. *See NYSE, Section 102.01B, Footnote E*. The connection between the purchase of the security and the registration statement is clear.

Slack argues that past cases in this circuit and others limit the meaning of "such security" in Section 11 to only registered shares. Slack asks that the court apply Section 11 to direct listings in the same way it has in cases with successive registration statements, requiring plaintiffs to prove purchase of *registered* shares pursuant to a particular registration statement. *See Century Aluminum*, 729 F.3d at 1106; *Barnes*, 373 F.2d at 273; *Lee*, 294 F.3d at 976. To interpret Section 11 in this way would undermine this section of the securities law.

In a direct listing, registered and unregistered shares are released to the public at once. There is no lock-up period in which a purchaser can know if they purchased a registered or unregistered share. Thus, interpreting Section 11 to apply only to registered shares in a direct listing context would essentially eliminate Section 11 liability for misleading or

false statements made in a registration statement in a direct listing for both registered and unregistered shares. While there may be business-related reasons for why a company would choose to list using a traditional IPO (including having the IPO-related services of an investment bank), from a liability standpoint it is unclear why any company, even one acting in good faith, would choose to go public through a traditional IPO if it could avoid any risk of Section 11 liability by choosing a direct listing.[6] Moreover, companies would be incentivized to file overly optimistic registration statements accompanying their direct listings in order to increase their share price, knowing that they would face no shareholder liability under Section 11 for any arguably false or misleading statements.[7] This interpretation of Section 11 would create a loophole large enough to undermine the purpose of Section 11 as it has been understood since its inception.[8]

---

[6] This is particularly true now that the NYSE rule has been amended to allow a company to sell its own shares and raise capital through a Primary Direct Floor Listing. *See supra* note 2.

[7] The court notes that some SEC commissioners also voiced concerns about the Primary Direct Floor Listing rule. *See* Allison H. Lee, Caroline A. Crenshaw, *Statement on Primary Direct Listings*, SECURITIES AND EXCHANGE COMMISSION (Dec. 23, 2020), https://www.sec.gov/news/public-statement/lee-crenshaw-listings-2020-12-23 (noting that the "NYSE has not met its burden to show that [] the proposed rule change is consistent with the Exchange Act"). Given the dearth of law on the subject, and the opportunity for manipulation, *see supra* note 6, the concern might be well-taken.

[8] The SEC must approve changes to NYSE rules to confirm that they are consistent with Section 6(b)(5) of the Exchange Act including ensuring that the rules "are designed to prevent fraudulent and manipulative acts and practices[.]" 15 U.S.C. § 78f(b)(5); *see* SEC

As indicated, most importantly, interpreting Section 11 in this way would contravene the text of the statute. Slack's shares offered in its direct listing, whether registered or unregistered, were sold to the public when "the registration statement . . . became effective," thereby making any purchaser of Slack's shares in this direct listing a "person acquiring such security" under Section 11. 15 U.S.C. § 77k(a). Pirani has pled facts sufficient to establish statutory standing under Section 11 and the court affirms the district court's denial of Slack's motion to dismiss with respect to Pirani's Section 11 claim.

## II. Standing under Section 12

Section 12(a)(2) of the Securities Act of 1933 provides that:

> Any person who . . . *offers or sells a security* . . . by the use of any means or instrument of transportation or communication in interstate commerce or of the mails, *by means of a prospectus* or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements , . . . shall be liable . . . *to the person purchasing such*

---

Approval 2020, 85 Fed. Reg. 85,810. In its order approving the NYSE's direct listing rule, the SEC noted that while the direct listing rule "may present tracing challenges," it did not "expect any such tracing challenges . . . to be of such magnitude as to render the proposal inconsistent with the Act." *Id*. at 85,816. In fact, the SEC cited the district court opinion in this case to demonstrate how the judge-made traceability doctrine might evolve, and as evidence that there was no "precedent to date in the direct listing context which prohibits plaintiffs from pursuing Section 11 claims." *Id*. at 85,816 & n.112.

*security from him*, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2) (emphasis added). Under Section 12(a)(2), liability falls on a person who "offers or sells a security" to the public by means of a false or misleading prospectus or oral communication. *See Pinter v. Dahl*, 486 U.S. 622, 641–47 (1988). The Supreme Court has determined that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 584 (1994); *see also Century Aluminum*, 729 F.3d at 1106 (noting that a "prospectus. . . is treated as part of the company's registration statement for purposes of § 11").

For the purposes of our analysis, Section 12 liability (resulting from a false prospectus) is consistent with Section 11 liability (resulting from a false registration statement). 15 U.S.C. §§ 77k, 77l; *see Hertzberg*, 191 F.3d at 1081 ("Section 12 . . . permits suit against a seller of a security by prospectus"). It follows from the analysis of "such security" in Section 11, that the shares at issue in Slack's direct listing, registered and unregistered, were sold "by means of a prospectus" because the prospectus was a part of the offering materials (i.e. the registration statement and prospectus) that permitted the shares to be sold to the public. As previously determined, neither the registered nor unregistered shares would be available on the exchange without the filing of the offering materials. *See NYSE, Section 102.01B, Footnote E*.

Thus, Pirani has satisfied part of the statutory standing analysis under Section 12(a)(2) because all of Slack's shares in this direct listing were sold "by means of a prospectus."

Section 12 also includes an express privity requirement between the seller and the purchaser that is not present in Section 11. *See Hertzberg*, 191 F.3d at 1081 (noting that the text of Section 12 "'the person purchasing such security from him,' thus specif[ies] that a plaintiff must have purchased the security directly from the issuer of the prospectus"). Slack raises this issue in its briefing to the court, challenging Pirani's standing under Section 12(a)(2), asserting that none of the individual defendants are statutory sellers within the meaning of Section 12. Pirani does not challenge the district court's dismissal of his Section 12(a)(2) claim against Slack. On an interlocutory appeal, the court *may* reach any issues fairly raised in the certified district court order. *See Yamaha Motor*, 516 U.S. at 205 (holding "the appellate court may address any issue fairly included within the certified order"). This particular aspect of standing under Section 12(a)(2), however, does not appear to have motivated the district court's certification for interlocutory appeal and does not raise a novel issue or "involve[] a controlling question of law as to which there is substantial ground for difference of opinion[.]" 28 U.S.C. § 1292(b). The dispute is heavily fact dependent and we decline to address it at this juncture.

## III.    Section 15 Claims

Section 15 of the Securities Act of 1933 provides that "[e]very person who . . . controls any person liable under sections [Section 11 and 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]" 15 U.S.C. § 77o(a). Because standing

exists for Pirani's Section 11 claim against Slack, standing exists for the dependent Section 15 claim against controlling persons. 15 U.S.C. § 77o(a). The district court's determination that Pirani has pled sufficient facts to plausibly allege that the individual defendants and the venture capital defendants[9] are controlling persons under Section 15 is not challenged before us.[10]

## CONCLUSION

For the reasons stated above, we affirm the district court's partial denial of Slack's motion to dismiss. Statutory standing exists under Sections 11 and 15, and under Section 12(a)(2) to the extent it parallels Section 11. **AFFIRMED.**

---

[9] The individual defendants do not argue that they are not controlling persons.

[10] The SEC defines control to be "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "The standards for liability as a controlling person under § 15 are not materially different from the standards for determining controlling person liability under § 20(a)." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n.4 (9th Cir. 1990). Under Section 20(a) (and therefore under Section 15) whether a party is a controlling person "is an intensely factual question." *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (citation omitted).

MILLER, Circuit Judge, dissenting:

This case involves the application of sections 11 and 12 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, to a direct listing of shares on a stock exchange. Although the factual setting of the case may be novel, the legal issues it presents are not. The interpretation of sections 11 and 12 has been settled for decades, and applying that interpretation, I would reverse the district court's order and remand with instructions to grant the motion to dismiss in full.

In a traditional initial public offering (IPO), a company seeking to go public files a registration statement and then sells shares issued under that registration statement. Typically, the investment bank underwriting the offering insists on what is known as a "lock-up period," during which existing shareholders—such as the company's employees or its early investors, who may hold shares that were issued under an exemption to the registration requirement—may not sell their unregistered shares. Anyone purchasing shares on the stock exchange during the lock-up period can therefore be certain that the shares were issued under the registration statement.

In this case, Slack Technologies, Inc., went public through a direct listing, with no underwriters and no lock-up period. It did not issue any new shares; it simply filed a registration statement so that the shares already held by employees and early investors could begin to be traded publicly on the New York Stock Exchange. On the first day of the offering, 118 million registered shares and 165 million unregistered shares were available for purchase on the exchange, and Fiyyaz Pirani purchased 30,000 shares. He now asserts that the registration statement contained material omissions. But because brokers generally do not keep track of which shares were issued when, Pirani cannot prove that

his shares were issued under the registration statement that he says was inaccurate.

That failure of proof is significant and, as I will explain, outcome-determinative. Sections 11 and 12 impose strict liability for any "untrue statement of a material fact or [omission of] a material fact" in a "registration statement" or "prospectus," respectively. 15 U.S.C. §§ 77k(a), 77*l*(a)(2). Strict liability is strong medicine, so the statute tempers it by limiting the class of plaintiffs who can sue. Section 11 provides statutory standing only to "any person acquiring such security," *id.* § 77k(a), while section 12 similarly provides standing only "to the person purchasing such security," *id.* § 77*l*(a). In that respect, both provisions are unlike section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, which allows a broad class of plaintiffs to sue for false statements in connection with the sale of a security, but only if the defendant acted with scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318–19 (2007).

I begin with section 11. As noted, that provision allows a suit only by a "person acquiring such security." 15 U.S.C. § 77k(a). Because the phrase "such security" has no antecedent in section 11, the statute is ambiguous as to what sort of security a plaintiff must acquire to have standing.

More than 50 years ago, the Second Circuit resolved that ambiguity in a landmark decision authored by Judge Friendly. *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967). In *Barnes*, the defendants had conducted a secondary offering—that is, the company's stock was already publicly traded under a previously filed registration statement, and the company filed a new registration statement so that it could sell more stock. *Id.* at 270. The plaintiffs purchased shares during the secondary offering, and they sought to

bring a section 11 action based on inaccuracies in the new registration statement. *Id.* The Second Circuit held that they could not do so because they could not prove that the shares they purchased had been issued under the new registration statement rather than the earlier one. *Id.* at 271–72. In reaching that conclusion, the court noted that the phrase "any person acquiring such security" lent itself to both a "narrower reading—'acquiring a security issued pursuant to the registration statement'" and "a broader one—'acquiring a security of the same nature as that issued pursuant to the registration statement,'" and it adopted the narrower reading, which it described as a "more natural" interpretation of the text. *Id.*

Until today, every court of appeals to consider the issue, including ours, has done the same. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768 & n.5 (1st Cir. 2011); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 975–78 (8th Cir. 2002); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999); *Joseph v. Wiles*, 223 F.3d 1155, 1159–60 (10th Cir. 2000), *abrogated on other grounds by California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017); *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1271 (11th Cir. 2007). In *Hertzberg*, we held that "such security" requires the plaintiff to "have purchased a security issued under that, rather than some other, registration statement." 191 F.3d at 1080. And in *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1106 (9th Cir. 2013), we reiterated that "such security" means that the shares were "issued under the allegedly false or misleading registration statement."

That principle ought to resolve this case. Because Pirani cannot show that the shares he purchased "were issued under the allegedly false or misleading registration statement," he lacks statutory standing to bring a section 11 claim. *Century Aluminum*, 729 F.3d at 1106. (The same reasoning also forecloses Pirani's claim under section 15, 15 U.S.C. § 77*o*, which is derivative of his section 11 claim.)

But the court declines to follow our precedent. In this, it follows the district court, which believed that the issue presented here "appears to be one of first impression" because prior section 11 cases arose in the context of successive registrations in IPO listings, while this case involves a direct listing. But nothing in the reasoning of the cases suggests that the distinction should matter. In cases involving successive registrations, we did not invent a requirement that a plaintiff's shares must have been issued under the registration statement because we thought it seemed like a good idea; we interpreted the statutory text to impose that requirement. The Supreme Court has reminded us that a statute is not "a chameleon, its meaning subject to change" based on the varying facts of different cases. *Clark v. Martinez*, 543 U.S. 371, 382 (2005). If "such security" means that plaintiffs must have purchased shares "issued under the allegedly false or misleading registration statement" in successive-registration cases, *Century Aluminum*, 729 F.3d at 1106, then that is also what it means in direct-listing cases.

The court says that it is not adopting "the broad meaning of Section 11 that Judge Friendly rejected." But neither is it adopting the narrow reading that Judge Friendly accepted, or else it would have to reverse the district court. So what does "such security" mean? The court says that it "look[s] directly to the text of Section 11 and the words 'such security'" to

determine what "such security" means in the context of a direct listing. But the court never analyzes the text. Instead, it turns to the rules of the New York Stock Exchange. Because those rules did not allow Slack to sell its unregistered shares until the registration statement was filed, the court concludes that "such security" in section 11 must encompass any security whose "public sale cannot occur without the only operative registration in existence." That definition has no basis in the statutory text, which, as construed in *Barnes*, gives standing only to those "acquiring a security issued pursuant to the registration statement." 373 F.2d at 271. And although the court asserts that "[a]ll of Slack's shares sold in this direct listing, whether labeled as registered or unregistered, can be traced to that one registration," it does not suggest that all of the shares were issued under that registration statement. It cannot do so, given that most of the shares that began trading on the day of the listing had been issued well before the registration statement was filed.

Nor does the legislative history support the court's interpretation. To the contrary, the House Report explains that section 11 "entitle[s] the buyer of securities *sold upon a registration statement* . . . to sue for recovery." H.R. Rep. No. 73-85, at 9 (1933) (emphasis added). As the Second Circuit recognized, the phrase "securities sold upon a registration statement" plainly refers to registered securities. *Barnes*, 373 F.2d at 273. It does not refer to unregistered securities, even if those securities must wait until a registration statement becomes effective before they can be sold on an exchange.

What appears to be driving today's decision is not the text or history of section 11 but instead the court's concern that it would be bad policy for a section 11 action to be

unavailable when a company goes public through a direct listing. That policy concern is neither new nor particularly concerning. The plaintiffs in *Barnes* made precisely the same point about section 11 liability for secondary offerings, where, as they pointed out, it would be "impossible to determine whether previously traded shares are old or new." 373 F.2d at 272. The court acknowledged the point but concluded that it did not compel a broader interpretation of section 11 when such a "reading would be inconsistent with the over-all statutory scheme." *Id.* After all, in that context, as in this one, a company that can avoid strict liability under section 11 for inadvertent omissions or misleading statements in its registration statement will remain subject to liability under section 10(b) of the Securities Exchange Act for materially false statements made with scienter. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

More importantly, whatever the merit of the policy considerations, they are no basis for changing the settled interpretation of the statutory text. If we "alter our statutory interpretations from case to case, Congress [has] less reason to exercise its responsibility to correct statutes that are thought to be unwise or unfair." *Neal v. United States*, 516 U.S. 284, 296 (1996). Instead, "[t]he place to make new legislation, or address unwanted consequences of old legislation, lies in Congress." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020).

For similar reasons, I also would hold that Pirani lacks standing under section 12. Section 12(a)(2) provides that any person who "offers or sells a security . . . by means of a prospectus" can be held liable for any untrue statements or omissions of material fact in the prospectus. 15 U.S.C.

§ 77*l*(a)(2). Just like section 11, section 12 limits standing to those who have "purchas[ed] such security." *Id.* § 77*l*(a).

We have not previously considered whether the phrase "purchasing such security" in section 12 requires plaintiffs to show that they purchased shares issued under the registration statement they are challenging. But the text of the statute resolves that question. Section 12 differs from section 11 because "such security" in section 12 has a clear antecedent: It is a security "offer[ed] or s[old] . . . by means of a prospectus." 15 U.S.C. § 77*l*(a)(2). "Prospectus," in turn, "is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995). The unambiguous meaning of a security offered or sold "by means of a prospectus" is therefore a registered security sold in a public offering.

The court concludes otherwise because, as with section 11, it bases its interpretation on the rules of the New York Stock Exchange instead of the text that Congress enacted. In the court's view, securities sold "by means of a prospectus" include unregistered shares in a direct listing because those shares cannot be sold publicly until a registration statement is filed. But for a security to be offered or sold "by means of a prospectus," the registration statement must be the means through which the security is offered to the public. That is true only of registered securities. Even if the filing of the registration statement determines *when* an unregistered security can be offered to the public in a direct listing, the registration statement does not apply to the unregistered security and therefore is not the means through which it is offered or sold. Because the text of section 12 requires a plaintiff to have purchased a registered security to have standing, Pirani may not bring a section 12 claim.

"[N]o amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021). Both sections 11 and 12 require a plaintiff to show that he purchased a security issued under the registration statement he is challenging. Whether or not that is good policy in the context of a direct listing, our role is to interpret statutes as they are—not to shape them into what we wish they could be. *See Bostock*, 140 S. Ct. at 1738. Because Pirani cannot show that he purchased a registered security, I would hold that he lacks standing to bring claims under sections 11, 12, or 15 of the Securities Act.